No. 15-3738

# In The United States Court of Appeals
# For the Seventh Circuit

KEVIN W. CULP, MARLOW DAVIS, FREDDIE REED-DAVIS, DOUGLAS
W. ZYLSTRA, JOHN S. KOLLER, STEVE STEVENSON, PAUL HESLIN,
MARLIN MANGELS, JEANELLE WESTROM, SECOND AMENDMENT
FOUNDATION, INC., ILLINOIS CARRY and ILLINOIS STATE RIFLE
ASSOCIATION,

Plaintiffs-Appellants,

v.

LISA MADIGAN, in her Official Capacity as Attorney General of the State of
Illinois; LEO P. SCHMITZ, in his Official Capacity as Director of the Illinois
State Police, and JESSICA TRAME, as Bureau Chief of the Illinois State
Police Firearms Services Bureau,

Defendants-Appellees.

Appeal from a Judgment of the United States District Court
for the Central District of Illinois
The Hon. Sue E. Myerscough, District Judge
Case No. 3:14-CV-3320

APPELLANTS' BRIEF AND REQUIRED SHORT APPENDIX

David G. Sigale
Law Firm of David G. Sigale, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547/630.596.4445
dsigale@sigalelaw.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-3738

Short Caption: Kevin W. Culp, et al v. Lisa Madigan, et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Kevin W. Culp, Marlow Davis, Freddie Reed-Davis, Douglas W. Zylstra, John S. Koller, Steve Stevenson

Paul Heslin, Marlin Mangels, Jeanelle Westrom, Second Amendment Foundation, Inc.,

Illinois Carry, Illinois State Rifle Association

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Law Firm of David G. Sigale, P.C.

(3)   If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

Second Amendment Foundation, Inc. - None; Illinois Carry - None; Illinois State Rifle Association - None

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Second Amendment Foundation, Inc. - None; Illinois Carry - None; Illinois State Rifle Association - None

Attorney's Signature: s/ David G. Sigale                    Date: January 28, 2016

Attorney's Printed Name: David G. Sigale

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ✕   **No** _____

Address: 799 Roosevelt Road, Suite 207

Glen Ellyn, IL 60137

Phone Number: 630.452.4547                    Fax Number: 630.596.4445

E-Mail Address: dsigale@sigalelaw.com

# TABLE OF CONTENTS

Table of Contents ............................................................... i

Table of Authorities ......................................................... iii

Jurisdictional Statement ..................................................... 1

Statement of Issues ........................................................... 2

Statement of the Case ....................................................... 3

    1.    Illinois's Statute Bars Virtually All Non-Residents from Applying for a Concealed Carry License ........................ 4

    2.    The Non-Resident Prohibition's Impact on the Plaintiffs and Similarly-Situated Non-Residents ........................... 9

    3.    Procedural History ..................................................... 17

    4.    The District Court's Decision ...................................... 17

Summary of Argument ..................................................... 18

Argument........................................................................ 21

I.    THE COURT'S REVIEW IS DE NOVO................................... 21

II.    PLAINTIFFS WILL PREVAIL ON THE MERITS, AS ILLINOIS'S VIRTUAL BAN ON NON-RESIDENT CONCEALED CARRY LICENSE APPLICATIONS VIOLATES THEIR ARTICLE IV AND THEIR SECOND AND FOURTEENTH AMENDMENT RIGHTS ...................................................................... 22

    1.    Preliminary Injunction Standard ................................. 22

i

2.  The Prohibition Violates Plaintiffs' Second Amendment Rights ........................................................... 24

3.  The Prohibition Violates Plaintiffs' Fourteenth Amendment Equal Protection Rights ............................................. 29

4.  The Prohibition Infringes on Plaintiffs' Enjoyment of a Fundamental Privilege Under Article IV...…................. 38

5.  The Prohibition Violates Plaintiffs' Fourteenth Amendment Due Process Rights ……………..………… 44

III.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY INJUNCTIVE RELIEF............. 46

IV.  TRADITIONAL LEGAL REMEDIES ARE INADEQUATE TO RELIEVE THE HARM OF THE BAN ON CONCEALABLE FIREARM REGISTRATION BY QUALIFIED NON-RESIDENTS ..................................................... 50

V.  THE BALANCE OF INTERESTS FAVORS IMMEDIATE INJUNCTIVE RELIEF.................................................. 52

CONCLUSION .......................................................... 58

# TABLE OF AUTHORITIES

*Cases*

*Allied Stores of Ohio, Inc. v. Bowers,*
 358 U.S. 522 (1959) ............................................................ 30

*Att'y Gen. of N.Y. v. Soto-Lopez,*
 476 U.S. 898 (1986) ............................................................ 34

*Baldwin v. Fish and Game Comm'n of Montana,*
 436 U.S. 371 (1978) ............................................................ 41

*Bolton v. Bryant,*
 71 F.Supp.3d 802 (N.D.Ill. 2014) ................................. 56, 57

*Brown v. Entm't Merchs. Ass'n,,*
 131 S. Ct. 2729 (2011) ....................................................... 34

*Burlington N. & Santa Fe Ry. Co. v. Bhd. Of Locomotive Eng'rs,*
 367 F.3d 675 (7th Cir. 2004) .............................................. 21

*Buttitta v. City of Chicago,*
 9 F.3d 1198 (7th Cir. 1993) ................................................ 45

*Christian Legal Soc'y v. Walker,*
 453 F.3d 853 (7th Cir. 2006) .............................................. 51

*City of Cleburne v. Cleburne Living Center,*
 473 U.S. 432 (1985) ............................................................ 49

*Clark v. Jeter,*
 486 U.S. 456 (1988) ............................................................ 31

*Council of Insurance Agents & Brokers v. Molasky-Arman,*
    522 F.3d 925 (9th Cir. 2008) ................................... 40, 41, 42, 43

*Corfield v. Coryell,*
    6 F. Cas. 546 (C.C.E.D. Pa. 1823) ........................................... 39

*District of Columbia v. Heller,*
    128 S. Ct. 2783 (2008)............................................................ *passim*

*Duncan v. Louisiana,*
    391 U.S. 145 (1968) ............................................................ 45

*Elrod v. Burns,*
    427 U.S. 347 (1976) ........................................................ 47, 51

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ........................................ *passim*

*Gateway E. Ry. Co. v. Term. R.R. Ass'n,*
    35 F.3d 1134 (7th Cir. 1994) ................................................. 50

*Gilbert v. Homar,*
    520 U.S. 924 (1997) .............................................................. 46

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the*
    *United States of Am., Inc.,*
    549 F.3d 1079 (7th Cir. 2008) ................................. 22, 23, 29, 53

*Grossbaum v. Indianapolis-Marion County Building Authority,*
    63 F.3d 581 (7th Cir. 1995) ................................................. 24

*Hess v. Pawloski,*
    274 U.S. 352 (1927) ............................................................ 39

*Hicklin v. Orbeck*,
    437 U.S. 518 (1978) ............................................................. 40

*Hudson v. City of Chicago*,
    374 F.3d 554 (7th Cir. 2004) ...................................... 45, 46

*Jamie S. v. Milwaukee Pub. Schs.*,
    No. 09-2741, 2012 U.S. App. LEXIS 2089 at *50
    (7th Cir. Feb. 3, 2012) ........................................................ 22

*Joelner v. Wash. Park*,
    378 F.3d 613 (7th Cir. 2004) ...................................... 23, 51

*Kikumura v. Hurley*,
    242 F.3d 950 (10th Cir. 2001) .......................................... 49

*Lawson Prods., Inc. v. Avnet, Inc.*,
    782 F.2d 1429 (7th Cir. 1986) .......................................... 23

*Libertarian Party v. Packard*,
    741 F.2d 981 (7th Cir. 1984) ...................................... 23, 53

*Mance v. Holder*,
    74 F.Supp.3d 795 (N.D.TX 2015) ................................ 34, 35

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ...................................................... 45, 46

*McDonald v. City of Chicago*,
    130 S. Ct. 3020 (2010) .............................. 25, 33, 42, 46

*Mem'l Hosp. v. Maricopa Cnty.*,
    415 U.S. 250 (1974) .......................................................... 34

*Metropolitan Life Insurance Company v. Ward,*
    470 U.S. 869 (U.S. 1985) ................................. 30, 36

*Minton v. St. Bernard Parish School Board,*
    803 F.2d 129 (5th Cir. 1986) ........................... 36, 37

*Mishaga v. Schmitz,*
    2015 WL 5731653 (C.D. Ill. Sept. 30, 2015) ........................... 19

*Moore v. Detroit School Reform Board,*
    293 F.3d 352 (6th Cir. 2002) ...............................…..... 31

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) ......................….... *passim*

*Nuxoll v. Indian Prairie School District No. 204,*
    523 F.3d 668 (7th Cir. 2008) ................................. 51

*Obergefell v. Hodges,*
    135 S.Ct. 2584, 192 L. Ed. 2d 609 (2015) ...........…................. 36, 45

*Plyler v. Doe,*
    457 U.S. 202 (1982) ................................... 30, 32

*Powell v Daily,*
    712 P.2d 356 (Wyo. 1986) ................................. 42

*Roland Mach. Co. v. Dresser Indus., Inc.,*
    749 F.2d 380 (7th Cir. 1984) ....................…............. 47, 50, 53

*Rum Creek Coal Sales, Inc. v. Caperton,*
    926 F.2d 353 (4th Cir. 1991) ................................. 49

*Sklar v. Byrne,*
    727 F.2d 633 (7th Cir. 1984) ...................…........ 31, 32, 33

*Sonnleitner v. York,*
    304 F.3d 704 (7th Cir. 2002) ................................................. 46

*Supreme Court of New Hampshire v. Piper,*
    470 U.S. 274 (1985) ......................................................... 40

*Supreme Court of Virginia v. Friedman,*
    487 U.S. 59 (1988) ................................................ 39, 40, 41

*Toomer v. Witsell,*
    334 U.S. 385 (1948) ...................................................... 40, 42

*Ty, Inc. v. Jones Group Inc.,*
    237 F.3d 891 (7th Cir. 2001)........................................... 22, 52

*United States v. Kaun,*
    827 F.2d 1144 (7th Cir. 1987) ............................................. 21

*Wallace v. Tilley,*
    41 F.3d 296 (7th Cir. 1994) ................................................. 46

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ......................................................... 31

*Williams v. North Carolina,*
    317 U.S. 287 (1942) ......................................................... 36

*Williams v. Vermont,*
    472 U.S. 14 (1985) ........................................................... 35

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008) ............................................................ 22

*Zobel v. Williams*,
　　457 U.S. 55 (1982) ……………………………………………... 40


*Constitutional Provisions*

U.S. Const. Art. IV § 2 …………………………………….….. *passim*

U.S. Const. amend. II ……………………………………….…... *passim*

U.S. Const. amend. XIV………………….………………………. *passim*


*Statutes, Rules, and Ordinances*

430 ILCS 66/1, *et seq.* ……………………………………………… 3

430 ILCS 66/40 …………………………………………… *passim*

720 ILCS 5/24-1 ……………………………………….…..… 5, 6

720 ILCS 5/24-1.6  ….………………………………………… 6, 7, 8

720 ILCS 5/24-2(a-5) ……………………………………………... 8


*Other Authorities*

1A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2948.1
(2d ed. 1995) ……………………………………………………..…. 49

Howell, Tim. *Privilege and Immunities of State Citizenship* (1918) ….39

Meyers, *The Privileges and Immunities of Citizens in the Several States*
*(pt. 2)*, 1 Mich. L. Rev. 364 (1903) …………………………………. 39

Jurisdictional Statement

Plaintiffs-Appellants ("Plaintiffs") seek declaratory and injunctive relief barring enforcement of the State statute 430 ILCS 66/40, which allows non-residents of Illinois with concealed carry licenses in their home states to apply for a concealed carry license in Illinois, under the Second and Fourteenth Amendments the United States Constitution, and 42 U.S.C. § 1983. The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983.

Plaintiff Second Amendment Foundation, Inc., is a non-profit corporation, organized under the laws of Washington with its principal place of business in Bellevue, Washington. Plaintiff Illinois State Rifle Association is a non-profit corporation, organized under the laws of Illinois with its principal place of business in Chatsworth, Illinois

This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1291(a)(1), in that on December 7, 2015, the District Court entered an Opinion and Order which denied Plaintiffs' Motion for preliminary injunctive relief.

i.     The order sought to be reviewed was entered December 7, 2015.  Short Appendix ("SA") 1-64.

ii.     There were no other orders tolling the time in which to appeal.

iii.     The Notice of Appeal was filed December 8, 2015.  Separate Appendix ("App.) 19.[1]

iv.     On December 9, 2015, the District stayed all proceedings below, pending the outcome of this appeal.  App.218.

## STATEMENT OF ISSUES

1.     Does the speculative harm of a hypothetical criminal with a firearm outweigh the Second Amendment and Fourteenth Amendment rights of the law-abiding residents of 45 states with concealed carry licenses to apply for a non-resident Illinois concealed carry license?

2.     Should injunctive relief have been granted against the Defendants' enforcement of 430 ILCS 66/40, which bans all concealed carry license-holders of 45 states from even

applying for an Illinois non-resident concealed carry license,

for no reason other than fear and speculation?

STATEMENT OF THE CASE

The fundamental Second Amendment right to bear loaded and
usable firearms for self-defense purposes, both inside and outside of
one's home, has been recognized and upheld by this Court.  It was that
recognition in *Moore v. Madigan*, 712 F.3d 933 (7th Cir. 2012), that led
to the passage of Illinois's Firearm Concealed Carry Act (430 ILCS 66/1,
*et seq.*) ("FCCA"), which allows qualified persons to obtain a license to
carry firearms in public in a concealed manner for self-defense.
However, that right is being denied, in a discriminatory and arbitrary
manner, to most people of the United States.  Worse, much of the
United States is forbidden from even *applying* for a license.

In this case, the government is attempting to offer hypotheticals
and speculation as justification for infringing the constitutional rights
of law-abiding persons.  The issue before the Court is whether that
speculative harm, rejected as a justification for the infringement of

---

[1]     All references to the Short Appendix will be denoted as "SA," while references

3

Second Amendment rights in this Court's decisions in *Moore*, and *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), nonetheless allows the State to deny the Second Amendment rights of millions of law-abiding persons in 45 states. That answer must be in the negative.

If the State is to enforce a mechanism for the licensure of non-residents to carry firearms in a concealed manner for self-defense, it must not do so in a manner that is discriminatory, or that burdens or prevents the exercise of Second Amendment or other constitutional rights.

1. *Illinois's Statute Bars Virtually All Non-Residents from Applying for a Concealed Carry License.*

430 ILCS 66/40 provides in pertinent part:

(a) For the purposes of this Section, "non-resident" means a person who has not resided within this State for more than 30 days and resides in another state or territory.

(b) The Department shall by rule allow for non-resident license applications from any state or territory of the United States with laws related to firearm ownership, possession, and carrying, that are substantially similar to the requirements to obtain a license under this Act.

---

to the Separate Appendix will be denoted as "App."

(c)     A resident of a state or territory approved by the Department under subsection (b) of this Section may apply for a non-resident license. The applicant shall apply to the Department and must meet all of the qualifications established in Section 25 of this Act, except for the Illinois residency requirement in item (xiv) of paragraph (2) of subsection (a) of Section 4 of the Firearm Owners Identification Card Act….

According to the Illinois State Police website, "substantially similar" as used in the paragraph above means "the comparable state regulates who may carry firearms, concealed or otherwise, in public; prohibits all who have involuntary mental health admissions, and those with voluntary admissions within the past 5 years, from carrying firearms, concealed or otherwise, in public; reports denied persons to NICS; and participates in reporting persons authorized to carry firearms, concealed or otherwise, in public through Nlets."

The Illinois State Police has deemed Hawaii, New Mexico, South Carolina and Virginia "substantially similar" for non-resident application purposes.  None of the individual Plaintiffs reside in these states.

720 ILCS 5/24-1 provides in pertinent part:

Sec. 24-1. Unlawful Use of Weapons

    (a)    A person commits the offense of unlawful use of weapons when he knowingly:

        (4)    Carries or possesses in any vehicle or concealed on or about his person except when on his land or in his own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm. . . ; or...

        (10)    Carries or possesses on or about his person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town, except when an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons, or except when on his land or in his own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm.

    (b)    Sentence. A person convicted of a violation of subsection 24-1(a)(1) through (5), subsection 24-1(a)(10), subsection 24-1(a)(1 1), or subsection 24-1(a)(13) commits a Class A misdemeanor.

    720 ILCS 5/24-1.6 provides in pertinent part:

Sec. 24-1.6. Aggravated unlawful use of a weapon

    (a)    A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly:

(1) Carries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm; or

(2) Carries or possesses on or about his or her person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town, except when an invitee thereon or therein, for the purpose of the display of such weapon or the lawful commerce in weapons, or except when on his or her own land or in his or her own abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm; and

(3) One of the following factors is present:

(A) the firearm possessed was uncased, loaded and immediately accessible at the time of the offense; or

(B) the firearm possessed was uncased, unloaded and the ammunition for the weapon was immediately accessible at the time of the offense.

(d) Sentence.

(1) Aggravated unlawful use of a weapon is a Class 4 felony; a second or subsequent offense is a Class 2

felony for which the person shall be sentenced to a term of imprisonment of not less than 3 years and not more than 7 years.

A person who is carrying a concealed handgun in public for self-defense is subject to the above-referenced criminal penalties (with certain exceptions that do not apply to any of the Plaintiffs) unless the person had a valid Illinois concealed carry license per 720 ILCS 5/24-1.6(3)(A-5),(B-5) and 720 ILCS 5/24-2(a-5).

These Code sections prohibit the Plaintiffs, and resident of the "other forty five states" from applying to obtain a concealed carry license, and therefore from the public concealed carry of firearms for self-defense.

Illinois's claimed purpose for enacting this prohibition, which serves solely to discriminate against most every qualified non-resident in the United States, including the Plaintiffs and members of the organizational Plaintiffs outside of Illinois, is shown to be illusory based on all the places non-residents are allowed to possess firearms in Illinois, the ease with which someone from a banned state can move to an allowed state and immediately apply for an Illinois CCL, the

inactivity surrounding Illinois CCL holders who leave the State and later return without it affecting their CCL status, and the utter lack of factual support for the claim that harm may result from allowing law-abiding persons to apply for the non-resident CCL. Therefore, there is no purpose Illinois can offer that passes constitutional muster.

2. *The Non-Resident Prohibition's Impact on the Plaintiffs and Similarly-Situated Non-Residents.*

*Individual Plaintiffs*

Kevin W. Culp is a natural person and a resident of the City of Blairsville, State of Pennsylvania. Culp is an Air Force Colonel stationed on orders at Scott Air Force Base near Belleville, IL, but is a legal resident of Pennsylvania who possesses a Pennsylvania driver's license and Pennsylvania license to carry a concealed weapon, as well as a concealed carry license from Florida. Culp is also a Basic Pistol Instructor and meets the qualifications to be an Illinois concealed carry licensing instructor.[2] (App.32-33.)

Marlow Davis is a natural person and a resident of the City of

---

[2] Since the filing of his Declaration with the District Court, Colonel Culp has in fact become an Illinois certified concealed carry instructor.

Milwaukee, State of Wisconsin. He possesses a Wisconsin driver's license and a Wisconsin license to carry a concealed weapon. He is retired and spends approximately half of his time in Chicago. He is the husband of co-Plaintiff Freddie Reed-Davis. (App.96-97.)

Freddie Reed-Davis is a natural person and a resident of the City of Milwaukee, State of Wisconsin. She is the wife of co-Plaintiff Marlow Davis. She possesses a Wisconsin driver's license and a Wisconsin license to carry a concealed weapon. She is a nurse working in Chicago. (App.98-99.)

Douglas W. Zylstra is a natural person and a resident of the City of Munster, State of Indiana. He possesses an Indiana driver's license and an Indiana license to carry a concealed weapon, as well as a concealed carry license and instructor certification from Utah. Zylstra is an Illinois State Police certified concealed carry instructor working for a firearm training company in Lansing, Illinois. (App.100-101.)

John S. Koller is a natural person and a resident of the City of Castle Rock, State of Colorado. He possesses a Colorado driver's license and a Colorado license to carry a concealed weapon, as well as concealed

carry licenses from Utah, Nevada and Arizona.  Koller was born &

raised in Chicago, Illinois, and still has family in the Chicago area, who

he visits.  He also makes periodic business trips to Illinois. (App.102-

103.)

Steven Stevenson is a natural person and a resident of the City of

Aurora, State of Colorado.  He possesses a Colorado driver's license.

Stevenson has a Colorado resident concealed carry license, as well as a

concealed carry license from Utah, and must occasionally traverse

Illinois on I-80 or I-88 to visit relatives in both Illinois and Michigan.

(App.84-85.)

Paul Heslin is a natural person and a resident of the City of

Defiance, State of Missouri.  He is originally from Lake County, Illinois.

He possesses a Missouri driver's license and a Missouri license to carry

a concealed weapon, as well as a concealed carry license from Florida,

and a Type 03 federal firearms license.  He is also an Illinois certified

concealed carry instructor. (App.88-89.)

Marlin Mangels is a natural person and a resident of the City of

Keokuk, State of Iowa.  He possesses an Iowa driver's license and an

Iowa license to carry a concealed weapon, as well as concealed carry licenses from Utah and Arizona. Keokuk is just across the Mississippi River from Hamilton, Illinois. Mangels frequently rides his bicycle up the River Road in Illinois, eats in restaurants in Hamilton, Illinois, travels to see his wife's family in the Chicago area, and travels I-80 through Illinois to visit friends in Massachusetts. (App.90-91.)

Jeanelle Westrom is a natural person and a resident of the City of Davenport, Iowa. She possesses an Iowa driver's license and an Iowa license to carry a concealed weapon, as well as one in Georgia. She has a firearms business in Davenport, Iowa but also a separate firearms business in Geneseo, Illinois, where she spends a considerable amount of her time. Westrom also possesses three federal firearms licenses, which are required for her businesses. (App.6.)

The individual Plaintiffs are licensed to possess concealed handguns in their states of residence, but are prohibited by 430 ILCS 66/40 from obtaining Illinois concealed carry licenses, and thus carrying a handgun in a concealed manner in Illinois for self-defense. This is because their states of residence are not approved for applications for

concealed carry licensing by the Defendants (App.6, 84-85, 88-91, 94-103.)

The individual Plaintiffs would apply for and obtain an Illinois concealed carry license, and would carry a loaded and functional concealed handgun in public in a concealed manner for self-defense, but refrain from doing so because they fear arrest, prosecution, fine, and imprisonment as they understand it is unlawful for an unlicensed individual to carry a concealed handgun in Illinois. (App.6, 84-85, 88-91, 94-103.)

*Organizational Plaintiffs*

Second Amendment Foundation, Inc. is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF's membership includes non-residents of Illinois who wish to obtain an Illinois concealed carry license but do not have a concealed carry license from an "approved state" according to the Illinois State Police. SAF has over 650,000 members and supporters nationwide. The purposes of SAF include education, research, publishing and legal action focusing on the

Constitutional right privately to own and possess firearms. SAF brings this action on behalf of itself and its members. (App.86-87.)

Members of SAF who are not residents of Illinois and do not have concealed carry licenses from an approved state, and thus are prohibited from applying for and obtaining an Illinois concealed carry license, would carry a loaded and functional concealed handgun in public in a concealed manner for self-defense, but refrain from doing so because they fear arrest, prosecution, fine, and imprisonment as they understand it is unlawful for an unlicensed individual to carry a concealed handgun in Illinois. (App.86-87.)

Illinois Carry is a non-profit membership organization incorporated under the laws of Illinois with its principal place of business in Shelbyville, Illinois. Illinois Carry has over 10,000 members and supporters in Illinois, and many members outside the State of Illinois. Illinois Carry is dedicated to the preservation of Second Amendment rights. Among Illinois Carry's purposes are educating the public about Illinois laws governing the purchase and transportation of firearms, aiding the public in every way in its power,

and supporting and defending the people's right to keep and bear arms, including the right of its members and the public to purchase, possess, and carry firearms. (App.92-93.)

Members of IC who are not residents of Illinois and do not have concealed carry licenses from an approved state, and thus are prohibited from applying for and obtaining an Illinois concealed carry license, would carry a loaded and functional concealed handgun in public in a concealed manner for self-defense, but refrain from doing so because they fear arrest, prosecution, fine, and imprisonment as they understand it is unlawful for an unlicensed individual to carry a concealed handgun in Illinois. (App.92-93.)

Illinois State Rifle Association is a non-profit membership organization incorporated under the laws of Illinois with its principal place of business in Chatsworth, Illinois. ISRA has over 17,000 members and supporters in Illinois, and many members outside the State of Illinois. The purposes of ISRA include securing the Constitutional right to privately own and possess firearms within Illinois, through education, outreach, and litigation. ISRA brings this

action on behalf of itself and its members. (App.104-105.)

Members of ISRA who are not residents of Illinois and do not have concealed carry licenses from an approved state, and thus are prohibited from applying for and obtaining an Illinois concealed carry license, would carry a loaded and functional concealed handgun in public in a concealed manner for self-defense, but refrain from doing so because they fear arrest, prosecution, fine, and imprisonment as they understand it is unlawful for an unlicensed individual to carry a concealed handgun in Illinois. (App.104-105.)

The individual Plaintiffs are members of the above-named organizations. (App.6, 84-85, 88-91, 94-103.)

Every day that passes without relief from Illinois's CCL non-resident application prohibition, all non-residents visiting, working in, or spending time in Illinois who are otherwise qualified to obtain a concealed carry license, including the individual Plaintiffs and the members and supporters of Plaintiffs SAF, IC, and ISRA, are frustrated in their ability to carry handguns in a concealed manner for self-defense in Illinois, and to enjoy their constitutional rights.

But for the criminal enactments challenged in this action, and Defendants' enforcement of same, the Plaintiffs and the qualified non-resident organization members would apply to obtain non-resident concealed carry licenses under 430 ILCS 66/40 and carry concealable firearms for self-defense, but refrain from doing so for fear of arrest, prosecution, fine and incarceration (App.6, 84-85, 88-91, 94-103).

4.    *Procedural History*

Plaintiffs filed their Complaint on October 22, 2014 (App.1). Plaintiffs then moved for a preliminary injunction on August 5, 2015 (App.20), with an accompanying Memorandum and Exhibits. After oral argument on October 16, 2015, the District Court denied Plaintiffs' Motion on December 7, 2015 (SA.1). At the time, Defendants had a pending Motion for Summary Judgment (Dkt.27), which the District Court denied as moot with leave to refile, pending the outcome of this appeal (App.218). At the same time, the District Court stayed all proceedings below, pending the outcome of this appeal (*Id.*).

5.    *The District Court's Decision*

On December 7, 2015, the District Court issued an opinion and

order denying the Plaintiffs' Motion for Preliminary Injunction (Dkt.29; SA.1). The District Court found that Plaintiffs were likely to succeed on the merits, that they were suffering irreparable harm, and that they had no adequate remedy at law (Dkt.29; SA.56, 59). However, the District Court ruled the balance of harm, which only slightly needed to favor the Plaintiffs, nonetheless favored Defendants. (Dkt.29; App.62).

SUMMARY OF ARGUMENT

Illinois's prohibition on virtually all non-residents obtaining a concealed carry license for self-defense, regardless of said non-resident's qualifications to do so, unquestionably violates the constitutional guarantees of the Second and Fourteenth Amendments, as well as Article IV of the Constitution, as do any other of Illinois's various statutes that, regardless of their facial validity, undeniably frustrate constitutionally secured equal rights of concealed handgun possession.

The challenged law is not compatible with the right to keep and bear arms, or with Plaintiffs' right to equal protection of the laws. The actual potential harm of allowing a qualified non-resident with an out-of-state concealed carry license to apply for an Illinois non-resident

concealed carry license is nil. Any non-resident applicant will have to comply with all requirements of the FCCA, including training, background checks and payment of fees.

Further, any alleged harm claimed by the State is belied by the fact that said qualified non-residents are already trusted by the State to:

- hunt in Illinois (430 ILCS 65/2(b)(5),(13));

- frequent a firing or shooting range in Illinois (430 ILCS 65/2(b)(7));

- shoot competitively in Illinois (430 ILCS 65/(b),(b-5),(b-10));

- possess a firearm in Illinois on private property with the owner's permission (430 ILCS 65/2(b)(10); See also Mishaga v. Schmitz, No. 10-cv-03187, 2015 WL 5731653 (C.D. Ill. Sept. 30, 2015);

- transport a concealed loaded and accessible firearm in her vehicle (430 ILCS 66/40(e)).

Finally, under the statute, someone who lives in a prohibited state his whole life, but then moves to one of the four acceptable states is immediately eligible, and an Illinois resident who leaves the State for

work, school or travel is not revoked or reviewed.[3]  This demonstrates that the Defendants' alleged fears about what CCL holders do out of state are not as concerning to them as they claim.  This also demonstrates that the hypothetical fear of most people who spend time out of the state has not come to pass.

However, the harm caused to Plaintiffs from the denial of their fundamental constitutional rights, not to mention the physical harm that could occur from the inability to properly defend themselves, far outweighs the hypothetical harm imagined by the State.

Considering the certainty of success on the merits, Plaintiffs are entitled to preliminary injunctive relief. Plaintiffs are suffering, and will continue to suffer, irreparable harm in the absence of injunctive relief, for which there is no adequate remedy at law. Granting Plaintiffs relief cannot injure Defendant. And given the degree to which Illinois's concealed carry license prohibition threatens the safety of Plaintiffs, the public interest - already favoring the exercise of fundamental rights -

---

[3]      Unless the person moves out of Illinois and establishes a primary domicile in another state (*e.g.* the person obtains a driver's license or state ID card in another state).

is clearly satisfied by immediately enjoining Illinois's unconstitutional practices.

This Court should therefore reverse the District Court's denial of a preliminary injunction, and remand the case with instructions to preliminarily enjoin the State's enforcement of 430 ILCS 66/40 against Plaintiffs and law-abiding qualified residents of the excluded 45 states, as well as to grant Plaintiffs all relief consistent with that Order.

ARGUMENT

## I.   THE COURT'S REVIEW IS *DE NOVO*.

"When we review the grant or denial of a preliminary or permanent injunction, as in any other case . . . the necessary legal conclusions are given *de novo* review." *United States v. Kaun*, 827 F.2d 1144, 1148 (7th Cir. 1987) (quotation and internal punctuation omitted). "No deference is due to a 'decision to deny a preliminary injunction that is premised on an error of law.'" *Burlington N. & Santa Fe Ry. Co. v. Bhd. Of Locomotive Eng'rs*, 367 F.3d 675, 678 (7th Cir. 2004) (quotation omitted). "As with any order reviewed under this standard, if the district court's [permanent injunction] analysis turned

on an error of law, the court necessarily abused its discretion." *Jamie S.*
*v. Milwaukee Pub. Schs.*, No. 09-2741, 2012 U.S. App. LEXIS 2089 at
*50 (7th Cir. Feb. 3, 2012).

## II. PLAINTIFFS WILL PREVAIL ON THE MERITS, AS ILLINOIS'S VIRTUAL BAN ON NON-RESIDENT CONCEALED CARRY LICENSE APPLICATIONS VIOLATES THEIR ARTICLE IV, AND THEIR SECOND AND FOURTEENTH AMENDMENT, RIGHTS.

### 1. Preliminary Injunction Standard

"A plaintiff seeking a preliminary injunction must establish that
he is likely to succeed on the merits, that he is likely to suffer
irreparable harm in the absence of preliminary relief, that the balance
of equities tips in his favor, and that an injunction is in the public
interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

Under this Court's two-part preliminary injunction test, Plaintiffs
must first establish: (1) some probability of success on the merits; (2)
lack of an adequate legal remedy; and (3) irreparable injury in the
absence of an injunction. *See Girl Scouts of Manitou Council, Inc. v.
Girl Scouts of the United States of Am., Inc.*, 549 F.3d 1079, 1086 (7th
Cir. 2008); *Ty, Inc. v. Jones Group Inc.*, 237 F.3d 891, 895 (7th Cir.

2001); *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986). Once these elements are met, the court conducts a "balancing phase" in which it "weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts*, 549 F.3d at 1086.

In this case, these factors are applied to Plaintiffs' legal claims that the offending statute 430 ILCS 66/40 violates Plaintiffs' Second Amendment right to "keep and bear arms," their Fourteenth Amendment rights to due process and equal protection of the laws, and their Article IV rights to the same privileges and immunities as residents. This Court has previously observed that when constitutional rights are at stake, "the merits of a dispute often are intertwined with the other three factors to be considered in the decision to issue or deny a preliminary injunction." *Libertarian Party v. Packard*, 741 F.2d 981, 985 (7th Cir. 1984). Indeed, "the likelihood of success on the merits will often be the determinative factor." *Joelner v. Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004). This should have been

the case here: Plaintiffs' constitutional rights are being violated by 430 ILCS 66/40, Plaintiffs are likely to succeed on the merits, money damages are inadequate, the ongoing deprivation is irreparable, and interest balancing must cede to the explicit constitutional protection. *See generally id.* Thus, analysis should begin by assessing the merits of Plaintiffs' claim. *See, e.g., Grossbaum v. Indianapolis-Marion County Building Authority*, 63 F.3d 581, 586 (7th Cir. 1995). However, Plaintiffs have satisfied all these threshold requirements for obtaining preliminary injunctive relief, and the balance of interests weighs heavily in their favor. The District Court erred in denying the injunction.

2.     *The Prohibition Violates Plaintiffs' Second Amendment Rights.*

Though the District Court correctly found this element in Plaintiffs' favor, due to the *de novo* nature of the Court's review, Plaintiffs will address this issue. As is by now well-known, the Supreme Court has held that the enumerated right to possess a firearm for lawful purposes, most notably for self-defense, is fundamentally core to

the Second Amendment. *Heller*, 128 S.Ct. at 2818. *See also*

*McDonald*, 130 S.Ct. 3020, 3043 (2010). This Court made very clear that

right extends outside of the home. *Moore*, 702 F.3d at 937.

In *Moore*, this Court held the ban of the public carrying of

firearms violated the Second Amendment and was unconstitutional,

and noted the importance of the right to self-defense:

> Both *Heller* and *McDonald* do say that "the need for
> defense of self, family, and property is most acute" in
> the home, *id*. at 3036 (emphasis added); 554 U.S. at
> 628, but that doesn't mean it is not acute outside the
> home. *Heller* repeatedly invokes a broader Second
> Amendment right than the right to have a gun in one's
> home, as when it says that the amendment
> "guarantee[s] the individual right to possess and carry
> weapons in case of confrontation." 554 U.S. at 592.
> Confrontations are not limited to the home.

*Id*. at 935-36.

This Court held that the State must make a "strong showing"

where the challenged restriction curtails "the gun rights of the entire

law-abiding adult population." *Id*. at 940. The District Court noted that

even the Defendants conceded that the restriction at bar is within the

scope of the Second Amendment (App. 61), and with good reason: the

prohibition in this case violates the rights of even more law-abiding people than in *Moore*.

As for the second step of the *Ezell* analysis, this Court has also compared the analysis of infringements of Second Amendment rights to those of infringements of First Amendment rights (*See Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (ban on gun ranges within State limits ruled unconstitutional)). According to *Ezell*, infringements on the core Second Amendment right of possession for self-defense must satisfy a level of scrutiny approaching strict scrutiny. *Id*. at 708. This likewise means that Illinois's prohibition, ". . . a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end." *Id*.

Plaintiffs disagree with the District Court's conclusion that the Second Amendment claims should be analyzed using intermediate scrutiny, even though the Plaintiffs agree with the conclusion that they have a likelihood of success on the merits.

When the standards required by *Moore* and *Ezell* are applied to

this case, it is evident Illinois cannot defend its arbitrary prohibition.

Further, under any level of heightened scrutiny (rational basis not even

being up for consideration under *Heller*, 128 S. Ct. 2783, 2818, fn 27

(2008)), 430 ILCS 66/40 fails.

In *Heller*, neither the D.C. Circuit nor the Supreme Court

bothered to engage in any balancing test or other extended analysis

before striking down Washington, D.C.'s ban on the possession of

functional firearms for self-defense, as that law literally contradicted a

"core" aspect of Second Amendment rights. *Heller*, 128 S.Ct.

at 2818.

It is not within the State's constitutional power to ban otherwise

qualified non-residents from possessing concealed firearms, including

handguns which have been expressly deemed constitutionally protected

by the Supreme Court. *See Heller*, 128 S.Ct. at 2817-18 ("Under any of

the standards of scrutiny that we have applied to enumerated

constitutional rights, banning from the home 'the most preferred

firearm in the nation to 'keep' and use for protection of one's home and

family,' would fail constitutional muster"). That Illinois has such a ban

violates the Second and Fourteenth Amendments.

The State has no interest, let alone an extremely strong or compelling one, in denying virtually all non-residents the fundamental Second and Fourteenth Amendment rights of handgun possession in the same manner available to residents, based solely on than state of residence, especially when doing so by the arbitrary method of simply refusing them the ability to submit an application. This restriction is particularly arbitrary in light of all the places in Illinois a non-resident can possess a firearm if she is licensed in her home state.

The Defendants claim they cannot properly vet or monitor a non-resident applicant or CCL holder, but even if true, there is no harm shown from that scenario, not logically and not from the information submitted by the Defendants. There is no information submitted that any violence problems in the 45 states are due to those states' CCL application procedures. Non-residents from the 45 banned states can move to one of the four allowed states and apply for a CCL. Illinois CCL holders who leave the State do not have their CCL's revoked or suspended, even though the State cannot possibly know what those

persons did while out of Illinois, unless they get convicted of an offense that lands them in a federal database. These people are all throughout Illinois, yet it is well-known these CCL holders are not the cause of any gun violence problem that may exist in Illinois.

A person intending to commit gun violence in Illinois is not going to undergo the training, fulfill the requirements, and pay the fees to first get an Illinois CCL.  The Plaintiffs, as law-abiding persons, wish to do so. In light of the above, the District Court should have granted Plaintiffs a preliminary injunction against the enforcement of 430 ILCS 66/40.

3.  *The Prohibition Violates Plaintiffs' Fourteenth Amendment Equal Protection Rights.*

The District Court did not address Plaintiffs' Fourteenth Amendment claim, given its finding that Plaintiffs had a likelihood of success on their Second Amendment claim, citing to *Girl Scouts*, 549 F.3d at 1096. (App. 74.)  Nevertheless, it is appropriate in this appeal to discuss Plaintiffs' other claims as well, especially since the District Court analyzed Plaintiffs' Second Amendment claims under

intermediate scrutiny[4], and Plaintiffs assert the Equal Protection claim requires strict scrutiny.

"The Fourteenth Amendment provides that '[no] State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.'" *Plyler v. Doe*, 457 U.S. 202, 210 (1982) (undocumented alien children being denied public school education violation of Equal Protection Clause). "The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises." *Id.* at 217. "[T]his [Supreme] Court always has held that the Equal Protection Clause forbids a State to discriminate in favor of its own residents solely by burdening 'the residents of other state members of our federation.'" *Metropolitan Life Insurance Company v. Ward*, 470 U.S. 869, 878 (U.S. 1985) (quoting *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 533 (1959) (Brennan, J., concurring)).

---

[4] Plaintiffs do not agree that "intermediate" is the appropriate level of scrutiny for their Second Amendment claims, given that the restriction cuts right at the core fundamental right of self-defense, *see Moore v. Madigan*; nevertheless, it is the level

"Under the Equal Protection Clause of the Fourteenth Amendment, courts apply strict scrutiny to statutes that involve suspect classifications or infringe upon fundamental rights." *Moore v. Detroit School Reform Board*, 293 F.3d 352, 368 (6th Cir. 2002) (citing *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (explaining that under the Equal Protection Clause of the Fourteenth Amendment, 'classifications based on race or national origin, and classifications affecting fundamental rights are given the most exacting scrutiny') (internal citations omitted). "This level of review demands that the statute be 'narrowly tailored to serve a compelling state interest." *Reform Board*, 293 F.3d at 368 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

The quintessential example of how the legal landscape has changed, and why Plaintiffs should prevail in this matter is *Sklar v. Byrne*, 727 F.2d 633 (7th Cir. 1984). In *Sklar*, the plaintiff moved to Chicago five days after it passed its now-defunct handgun ban in 1982. He challenged the ban on equal protection grounds, claiming residents

the District Court employed.

were grandfathered and were allowed to possess their previously purchased handguns, while new residents suffered discrimination in not having the same opportunity. *Id.* at 636. The District Court dismissed for failure to state a claim, and this Court affirmed.

First, the *Sklar* Court determined the standard of review, noting that:

> Where the legislative classification works to the disadvantage of a constitutionally suspect class -- based, for example, on race, nationality, alienage or religious affiliation -- then courts may uphold the classification only if it is 'precisely tailored to serve a compelling governmental interest.' *Plyler v. Doe*, 457 U.S. 202, 216-17 & n.14, 72 L. Ed. 2d 786, 102 S. Ct. 2382 (1982). Similarly, if the legislative classification impinges upon the exercise of a fundamental personal right, the classification must meet the same exacting 'compelling interest' standard. 457 U.S. at 216-17.

*Sklar*, 727 F.2d at 636 (boldface added).

Because *Sklar* predated *Heller* and *McDonald* and *Moore*, the *Sklar* Court held that the grandfather clause and simultaneous handgun ban for all those who did not comply did "not impinge upon any federal constitutional right to bear arms" and said "[n]or is the asserted right to bear arms pivotal in the effective exercise of

constitutionally guaranteed rights" and therefore applied rational basis scrutiny. *Id.* at 637. The *Sklar* Court then upheld the ordinance. *Id.* at 642-643.

It is well-known that the analysis of Second Amendment rights has changed since *Sklar* in 1984. The handgun ban was struck down in *McDonald*, when the Second Amendment right to keep and bear arms was recognized to be fundamental. The ban on public carrying of firearms was struck down by this Court in *Moore*, when it held that the fundamental Second Amendment right applies outside of the home. If the ban in *Sklar* was attempted today, it would quickly be struck down as a violation of Second and Fourteenth Amendment rights.

The arbitrary and discriminatory law at issue must be analyzed using strict scrutiny. There is no reason, compelling or otherwise, to ban virtually all Americans from even applying for a CCL. The requirements of their home state, supposedly the basis for deciding which states meet the ISP's exacting standard, is irrelevant, since all applicants must meet Illinois's requirements in order to be qualified. Further, the law is not narrowly tailored, since there are ways short of

a ban to ensure that only qualified non-residents obtain an Illinois CCL. "Strict scrutiny is a demanding standard that requires Defendants to show the governmental interest to be compelling and the associated regulation narrowly tailored to serve that interest. To be narrowly tailored, the curtailment of constitutional rights must be actually necessary to the solution." *Mance v. Holder*, 74 F.Supp.3d 795, 809 (N.D.TX 2015) (citing *Brown v. Entm't Merchs. Ass'n.*, 131 S. Ct. 2729, 2738 (2011)).

In *Mance*, the Court struck down the laws that collectively made up a federal interstate handgun transfer ban, which among other things prohibited people from purchasing firearms outside of their state of residence. In so doing, the Court held:

> The Supreme Court has also held that strict scrutiny is required where the challenged classification impinges on residency. *See Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 254-64 (1974) (holding that a challenge to a state durational-residency requirement to receive free, nonemergency medical care merited strict scrutiny, and the requirement was unconstitutional); *see also Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898 (1986). The Supreme Court applied strict scrutiny in situations where state laws discriminated against non-residents, and those cases involved benefits offered by

the state, not constitutional rights. *See id.*; *Mem'l Hosp.*, 415 U.S. at 254.

*Mance*, 2015 U.S. Dist. LEXIS 16679 at *43.

State laws have been successfully challenged under the Equal Protection Clause in other contexts as well. In *Williams v. Vermont*, 472 U.S. 14 (1985), a person bought a car in Illinois and then moved to Vermont. He was then forced to pay a "use tax" when he registered his car in Vermont, a tax which Vermont residents who purchased their cars out-of-state did not have to pay. The Vermont Supreme Court upheld the tax and dismissal of plaintiff's complaint, but the U.S. Supreme Court reversed, holding:

> "Vermont may choose not to penalize old residents who used their cars in other States, but it cannot extend that benefit to old residents and deny it to new ones. The fact that it may be rational or beneficent to spare some the burden of double taxation does not mean that the beneficence can be distributed arbitrarily . . . we can see no relevant difference between motor vehicle registrants who purchased their cars out-of-state while they were Vermont residents and those who only came to Vermont after buying a car elsewhere. To free one group and not the other from the otherwise applicable tax burden violates the Equal Protection Clause."

*Id.* at 27. Discriminatory taxing of out-of-state corporations was also

struck down under the Fourteenth Amendment's Equal Protection Clause. *See Metropolitan Life Insurance Company v. Ward*, 470 U.S. 869 (1985).

In this case, a fundamental right is being denied to most out-of-state residents. While the tax in *Williams* could not pass rational basis review, here there is no way the CCL application ban will pass strict scrutiny. *See Obergefell v. Hodges*, 135 S. Ct. 2584; 192 L. Ed. 2d 609, 634 (2015) ("Being married in one State but having that valid marriage denied in another is one of "the most perplexing and distressing complication[s]" in the law of domestic relations." (quoting *Williams v. North Carolina,* 317 U.S. 287, 299 (1942))). The enumerated Second Amendment right cannot be treated inferior to the right to marry found by the Supreme Court in the Fourteenth Amendment.

In *Minton v. St. Bernard Parish School Board*, 803 F.2d 129 (5th Cir. 1986), the plaintiff, a Mississippi resident, alleged she was owed payment on a tort judgment by the defendant school board in Louisiana, arising from when a school bus operated by the board struck the plaintiff's daughter. The plaintiff alleged the school board refused to

appropriate funds to pay judgments owed to non-residents of the Parish, while paying the similar claims of Parish residents. *Id.* at 131. She also alleged the Board paid claims of Louisiana residents, while refusing to appropriate funds to pay claims of non-Louisiana residents. *Id.* at 130. The District Court dismissed plaintiff's complaint for failure to state a claim. In reversing, the Fifth Circuit ruled: "Assessing her charge of discrimination on its face, as we must, we find that it is sufficient to state a claim for denial of that equality with residents that state agencies must accord non-residents. Even discretion may not be exercised on a discriminatory basis." *Id.*

In ruling that the plaintiff's complaint could proceed on her Fourteenth Amendment equal protection claim, the Court held:

> [E]very person is entitled to equal protection, even with regard to interests that do not constitute life, liberty, or property in the constitutional sense. If the Mintons can prove their allegation that the School Board illegally discriminates between residents and nonresidents of St. Bernard Parish, as they say in their complaint, or between residents of Louisiana and nonresidents, as they state in their brief, in determining whether to satisfy tort judgments, they are entitled at least to declaratory relief.

*Id.* at 132-133.

In this case, life and liberty are clearly at stake, as is the ability to exercise fundamental constitutional rights. There is no proof required beyond the plain language of the statute and the Declarations of the Plaintiffs as to their injuries as a result of Illinois's law. The Plaintiffs are being discriminated against in an arbitrary manner for no reason other than their states of residence. This discrimination is resulting in the denial of fundamental rights. On this basis as well, this Court must enjoin the enforcement of 430 ILCS 66/40 as unconstitutional.

4.  *The Prohibition Infringes on Plaintiffs' Enjoyment of a Fundamental Privilege Under Article IV.*

U.S. Const. Art. IV, § 2, Clause 1 states: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." This provides an additional basis for the relief Plaintiffs seek, which was also not addressed by the District Court once it found the Second Amendment was implicated by the non-resident CCL application restriction.

Article IV "prohibits state legislation discriminating against

citizens of other States." *Hess v. Pawloski*, 274 U.S. 352, 356 (1927).

"While the Privileges and Immunities Clause cites the term 'Citizens,' for analytic purposes citizenship and residency are essentially interchangeable." *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 64 (1988).

In *Corfield v. Coryell*, 6 F. Cas. 546 (C.C.E.D. Pa. 1823), the federal circuit court held that privileges and immunities in respect of which discrimination is barred include

> protection by the Government; the enjoyment of life and liberty ... the right of a citizen of one State to pass through, or to reside in any other State, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefits of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the State; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the State. (Emphasis added.)

Laws were unconstitutional that disadvantaged persons who made their homes in other states from exercising "fundamental rights." *See* Howell, Tim, *Privilege and Immunities of State Citizenship*, 33-61 (1918); Meyers, *The Privileges and Immunities of Citizens in the*

*Several States (pt. 2)*, 1 Mich. L. Rev. 364 (1903).

> The primary purpose of the Privileges and Immunities Clause 'was to help fuse into one Nation a collection of independent, sovereign States.' *Toomer [v. Witsell]*, 334 U.S. [385] at 395 [(1948)]. The clause 'was intended to create a national economic union,' *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 280, 105 S. Ct. 1272, 84 L. Ed. 2d 205 (1985), and 'was designed to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.' *Friedman*, 487 U.S. at 64 (internal quotations omitted); *Toomer*, 334 U.S. at 395.

*Council of Insurance Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 933-934 (9th Cir. 2008).

"Our opinions teach that Art. IV's Privileges and Immunities Clause "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy.'" *Zobel v. Williams*, 457 U.S. 55, 74 (1982) (O'Connor, J., concurring) (quoting *Toomer*, 334 U.S. at 395). The Clause protects a nonresident who enters a State to work." *Zobel*, 457 U.S. at 74 (O'Connor, J., concurring) (citing *Hicklin v. Orbeck*, 437 U.S. 518 (1978)).

First, the Court determines "whether the activity in question is

'sufficiently basic to the livelihood of the nation . . . as to fall within the purview of the Privileges and Immunities Clause.' *Friedman*, 487 U.S. at 64 (citations and internal quotation marks omitted). 'Second, if the challenged restriction deprives nonresidents of a protected privilege, we will invalidate it only if we conclude that the restriction is not closely related to the advancement of a substantial state interest.' *Id.* at 65 (citation omitted)." *Insurance Agents*, 522 F.3d at 934.

"In the first step of [the Court's] inquiry, it is '[o]nly with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally.' *Baldwin v. Fish and Game Comm'n of Montana*, 436 U.S. 371, 383, 98 S. Ct. 1852, 56 L. Ed. 2d 354 (1978)." *Insurance Agents*, 522 F.3d at 934. Certainly the fundamental right to protect one's self and family, wherever one goes, bears upon the vitality of the Nation.

In *Insurance Agents*, the Court found the right to sell insurance in another state to be a fundamental right or privilege covered by Article IV's Privilege and Immunities Clause. *Insurance Agents*, 522 F.3d at

41

934. The Second Amendment's right to defend one's life and those of one's family has been declared fundamental in *McDonald* (which largely cited to *Heller*) and *Moore*. Put simply, the right to armed self-defense cannot be considered less fundamental than the right to sell insurance. The Privileges and Immunities Clause applies here. *See also Powell v. Daily*, 712 P.2d 356 (Wyo. 1986) (statute requiring Wyoming residency to get professional hunting and fishing guide's license violated Privileges and Immunities Clause where alleged justification was not rationally related to exclusion of non-residents, no evidence supported claim that non-residents were less likely to obey laws of state, and less discriminatory means of achieving state's goals of safety and compliance with game laws existed in testing procedure).

As for the second prong of the Privileges and Immunities analysis, "[a] 'substantial reason' for discrimination does not exist 'unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed.'" *Insurance Agents*, 522 F.3d at 934 (quoting *Toomer*, 334 U.S. at 398).

There is no "substantial state interest" in refusing to allow people

to apply for a CCL, and whatever "evil" the Defendants and ISP are attempting to prevent by banning almost all non-residents from applying for a CCL, the Plaintiffs (and all other qualified non-residents) are not the problem. For example, there is no evidence whatsoever that any violence problem in Illinois (assuming, *arguendo*, that such a problem exists) is caused by qualified non-residents. If the non-resident applicant does not meet the qualifications that every Illinois CCL-holder must meet, then that person will be turned down. It is absurd that non-residents, including Plaintiffs in this case, can be Illinois CCL instructors and cannot even apply to obtain a CCL themselves. Plaintiff Culp is an active member of the military, with more firearms training than most persons, and cannot apply because he resides (when not being stationed in Illinois) in Pennsylvania. The Plaintiffs would all qualify for a CCL if only they were not arbitrarily banned from applying simply because the ISP does not like their states of residence.

Just as the *Insurance Agents* Court noted that "[t]here is no evidence in the record that licensed non-resident agents and brokers are inherently less trustworthy or less competent insurance professionals

43

than Nevada's resident agents," 522 F.3d at 936, so too it is that qualified CCL applicants from out-of-state are no less competent or untrustworthy that similarly-situated Illinois residents. And if an individual applicant from out-of-state is not qualified, the FCCA has a solution- the applicant will be turned down for the CCL. Discriminating against 45 of the 49 non-residents states in America is exactly what the Privileges and Immunities Clause was designed to prevent. The restriction must be enjoined.

5. *The Prohibition Violates Plaintiffs' Fourteenth Amendment Due Process Rights.*

Additionally, the virtual ban, which essentially denies concealed carry rights to virtually all qualified non-residents of Illinois without even the chance to show their qualifications to the ISP through the application process, is a violation of the Plaintiffs' Fourteenth Amendment due process rights.

"Under the Due Process Clause of the Fourteenth Amendment, no State shall 'deprive any person of life, liberty, or property, without due process of law.' The fundamental liberties protected by this Clause

include most of the rights enumerated in the Bill of Rights." *Obergefell v. Hodges*, 135 S.Ct. 2584, 192 L. Ed. 2d 609, 623 (2015) (citing *Duncan v. Louisiana*, 391 U.S. 145, 147-149 (1968)).

"To demonstrate a procedural due process violation, the plaintiffs must establish that there is '(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process.'" *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004) (quoting *Buttitta v. City of Chicago*, 9 F.3d 1198, 1201 (7th Cir. 1993)).

"Due process 'is not a technical conception with a fixed content unrelated to time, place[,] and circumstances[;]' instead, it 'is flexible and calls for such procedural protections as the particular situation demands.' *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (citations omitted). The process constitutionally required is determined by balancing three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safe-guards; and finally, the Government's interest.

*Gilbert v. Homar*, 520 U.S. 924, 931-32 (1997) (quoting *Mathews*, 424 U.S. at 335); *see also Sonnleitner v. York*, 304 F.3d 704, 712-14 (7th Cir. 2002); *Wallace v. Tilley*, 41 F.3d 296, 300 (7th Cir. 1994)." *Hudson*, 374 F.3d at 559-560.

The private interest affected by the State's virtual ban is great – Plaintiffs are substantially deprived of their Second Amendment rights, and their ability to defend their lives on the same footing as Illinois residents. Further, there is no process or procedure, pre- or post-deprivation, of which they can avail themselves to rectify the situation – short of Court intervention. That the Plaintiffs are being denied fundamental rights, without any procedure or process at all, is yet another reason why Plaintiffs are entitled to immediate injunctive relief against 430 ILCS 66/40 and its virtual non-resident ban.

## III. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY INJUNCTIVE RELIEF.

Plaintiffs, and the non-resident members of the organizational Plaintiffs, enjoy a fundamental right to keep and bear arms. *McDonald*,

130 S. Ct. at 3042. "[T]he inherent right of self-defense has been central to the Second Amendment right." *Heller*, 128 S. Ct. at 2817. The denial of constitutional rights, even if such deprivation were temporary, constitutes irreparable harm for purposes of granting injunctive relief (*See*, *e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The District Court agreed, citing to *Ezell*, (App.77) that irreparable injury will continue to exist in the absence of an injunction because Plaintiffs "will suffer irreparable harm in the interim – that is, harm that cannot be prevented or fully rectified by the final judgment after trial." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (emphasis added). Since the District Court ruled in Plaintiffs' favor on this point, Plaintiffs reiterate it here due to the *de novo* nature of the Court's review.

As noted above, this Court in *Ezell* favorably compared the fundamental freedoms of the Second Amendment to those fundamental freedoms of the First Amendment and deemed the deprivation of either to be irreparable harm. The *Ezell* Court held that "[t]he loss of a First Amendment right is frequently presumed to cause irreparable harm

based on 'the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.' . . . The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. (cite omitted).  Infringements of this right cannot be compensated by damages." *See Ezell*, 651 F.3d at 699.

Put simply, if 430 ILCS 66/40 is not enjoined, virtually all non-residents of Illinois, including the Plaintiffs, will continue to be unconstitutionally frustrated in their ability to exercise their fundamental Second Amendment rights.

Considering that the Second Amendment exists to secure the right of armed self-defense, the inability for non-residents to even apply to be able to defend themselves against violence in a manner allowed only to residents of Illinois and a few select states, also causes a profound loss of a sense of one's security, to say nothing of the irreparable harm resulting from a successful criminal attack. Thus, the irreparable harm

flowing from any delays in obtaining relief is palpable.

Additionally, the deprivation of the right of Plaintiffs and other non-residents to be treated equally under the law, and instead being discriminated due to their state of residence, in violation of the Equal Protection Clause of the Fourteenth Amendment, is an irreparable harm that continues so long as the offending statute is in place. Equal protection "is essentially a direction that all persons similarly situated shall be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citing 11A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995)); *See also Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 362 (4th Cir. 1991); *Ezell*, 651 F.3d at 699.

Under both the Second and Fourteenth Amendments, Plaintiffs are currently suffering the irreparable harm of the deprivation of their constitutional rights, and will continue to suffer said irreparable harm

every day 430 ILCS 66/40 is not enjoined.

## IV. TRADITIONAL LEGAL REMEDIES ARE INADEQUATE TO RELIEVE THE HARM OF THE BAN ON REGISTRATION BY QUALIFIED NON-RESIDENTS.

The District Court also agreed that there is no way to quantify, in terms of money damages, the inability to engage in protected Second Amendment activity such as the concealed carry of a firearm such as a handgun for self-defense, or the discrimination of being classified solely based on state of residence in violation of Fourteenth Amendment Equal Protection rights. (App.77.) The infringement of constitutional rights is frequently considered to be beyond quantification with money damages. This includes infringements of Second Amendment rights. *See Ezell*, 651 F.3d at 699; *See also, e.g., Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d at 386; *see also Gateway E. Ry. Co. v. Term. R.R. Ass'n.*, 35 F.3d 1134, 1140 (7th Cir. 1994). As with the previous elements, Plaintiffs reiterate their arguments due to the Court's *de novo* review.

This Court has repeatedly recognized that there is no adequate remedy at law for the deprivation of conduct that the Constitution

affirmatively protects, and that these types of constitutional deprivations are accordingly irreparable. The deprivation of First Amendment rights is irreparable *per se*, and this Court has often quoted Justice Brennan's statement in *Elrod* that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *See, e.g., Nuxoll v. Indian Prairie School District No. 204*, 523 F.3d 668, 669-70 (7th Cir. 2008) (quoting *Elrod*, 427 U.S. at 373 (plurality op.)); *accord Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *Joelner*, 378 F.3d at 620. The *Ezell* Court recognized that "[t]he Second Amendment protects similarly intangible and unquantifiable interests" as those secured by the First Amendment. *Id.* at 699. As such, the Seventh Circuit found that "[i]nfringements of this right cannot be compensated by money damages." *Id.* (emphasis added).

No legal remedies will be available to qualified non-residents who are unable to even apply for a concealed carry licenses because Illinois deprives almost all non-residents of their Second Amendment rights or the equal protection of Illinois's firearms laws. And quite obviously, no

legal remedies will suffice to compensate those killed or injured for the inability to lawfully possess concealed defensive arms, owing to Illinois's virtual ban.

## V. THE BALANCE OF INTERESTS FAVORS IMMEDIATE INJUNCTIVE RELIEF.

This is the only portion of the preliminary injunction analysis the District Court did not weigh in Plaintiffs' favor, and is the reason the District Court denied Plaintiffs the injunctive relief they seek. In addition to incorrectly analyzing Plaintiffs' Second Amendment claims using intermediate scrutiny, when strict or near-strict scrutiny was appropriate, and thus evaluating the likelihood of success too weakly in Plaintiffs' favor, the District Court erred in its overall analysis of this element, such that this Court must reverse that finding and grant injunctive relief.

Once the "threshold" factors have been met, the decision to grant or deny an injunction turns on the balance of equities. *See Ty, Inc. v. Jones Group Inc.*, 237 F.3d at 895. The court "weighs the irreparable harm that the moving party would endure without the protection of the

preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief" in light of the probable merit of the claim, and also considers the injunction's impact on non-parties (the "public interest"). *See Girl Scouts*, 549 F.3d at 1086. The merits are intrinsic to this analysis because "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach.*, 749 F.2d at 387; *accord Girl Scouts*, 549 F.3d at 1086; *see also Packard*, 741 F.2d at 985.

The Plaintiffs are certain to prevail on the merits, especially if the correct strict or near-strict scrutiny is used to analyze Plaintiffs' claims. The District Court held Plaintiffs had a likelihood of success on the merits, even using intermediate scrutiny, and the evidence the Defendant submitted to oppose Plaintiffs' Motion for Preliminary Injunction is the same evidence the Defendants submitted in support of their recently-pending Motion for Summary Judgment (compare App. 106-192 with App. 193-279). In other words, the same information that was insufficient to defeat Plaintiffs' claim on the merits in the first

instance should not be any more convincing the next time around.

Further, despite Defendants' concerns, Plaintiffs reiterate what this Court held in *Moore*:

> [T]he Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts. 554 U.S. at 636. If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban, *Heller* would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois.

*Moore*, 702 F.3d at 939. As this case is essentially a progeny of *Moore*, the above conclusion is just as applicable here as in that case.

Absent relief, Plaintiffs will continue to suffer irreparable injury in the loss of Second and Fourteenth Amendment rights, plus their Article IV privileges, if not actual physical harm. The State has no legitimate interest in the prohibition; and the public interest strongly favors equal protection of the law, and the respecting of fundamental rights, to say nothing of the ability of all qualified law-abiding persons in Illinois to defend themselves equally.

Further, the notion that a non-resident criminal or mentally ill

person, who wishes to commit gun violence in Illinois, is going to first apply for a concealed carry license is ludicrous. Likewise, the idea that refusing a CCL to someone intent on committing a criminal act with a firearm would stop that wrongful act is just as ludicrous.

Even more important, however, is that the above examples are simply hypothetical boogeymen. The Plaintiffs are real, and law-abiding, and qualified, and wish to apply for an Illinois CCL, knowing they will have to meet all requirements to do so. While gun violence is a serious issue, the granting of a non-resident CCL is not going to affect it in the least. Denying a non-resident CCL to a qualified individual, however, could have catastrophic consequences. Refusing to allow the qualified individuals from 45 of the United States to even *apply* for a non-resident CCL is a knee-jerk, arbitrary measure that will not improve public safety. This is especially true since Defendants have not pointed to a single violent incident in the affected 45 states regarding someone who was able to commit said violent act because he applied for,

or received, a CCL.[5]  The Court cited to the Defendants' concerns about cost, but no specifics were provided to the Court, and the Court cited no specific information.  Even if cost is a concern, it cannot be a justification to deny constitutional rights.  If a fundamental right could be denied due to claimed budgetary concerns, then any right would be in jeopardy at the hands of a governmental body that could not, or did not want to, allocate the alleged necessary funds.

The District Court cited to *Bolton v. Bryant*, 71 F.Supp.3d 802 (N.D.Ill. 2014), but that case is a challenge to the procedures of the Concealed Carry Licensing Review Board, which has no authority to act until someone has actually been allowed to apply for a CCL and law enforcement has filed an objection to a granting of the CCL.  *Id.* at 807.  Further, while the plaintiff was litigating his case against the Review Board, he sought a preliminary injunction to allow him to carry a concealed firearm without a license and without police interference.  *Id.*

_____

[5] Plaintiffs of course cannot say that a CCL-holder in America has never committed an act of violence, though such unknown incidents, even if they exist, are undeniably far less frequent than acts of gun violence committed by those without licenses, such as gang members and other criminals. Further, none of this outweighs the fundamental right of self-defense enjoyed by law-abiding persons in

at 808.  The Court denied the injunction because the plaintiff was attempting to bypass the licensing procedure, and the plaintiff's application was objected to by law enforcement for multiple arrests, and plaintiff offered nothing to refute the objection.  The stifling of potential harm was not directed towards the hypothetical; it was directed at the plaintiff himself.  *Id.* at 818-19.  In this case, Plaintiffs are law-abiding, one of them is an Air Force Colonel, multiple Plaintiffs are CCL instructors in Illinois, and the Plaintiffs are attempting to *participate* in the CCL licensing process, not bypass it.  *Bolton* is therefore inapposite to this case.

Put simply, when the District Court weighed a hypothetical calamity more heavily than the real people being affected every day by this restriction of fundamental rights, the District Court committed reversible error.

Because the balance of interests heavily tilts in favor of immediate injunctive relief, the District Court should be reversed.

---

45 States.

*CONCLUSION*

The order below should be reversed, and the case remanded with instructions to enter a preliminary injunction consistent with Plaintiffs' prayer for relief, as well as any and all relief consistent with such ruling.

Dated: January 28, 2016                    Respectfully submitted,

By:  _____/s/ David G. Sigale_____
         David G. Sigale

Attorneys for Plaintiffs-Appellants
Kevin W. Culp, Marlow Davis, Freddie
Reed-Davis, Douglas W. Zylstra, John
S. Koller, Steve Stevenson, Paul
Heslin, Marlin Mangels, Jeanelle
Westrom, Second Amendment
Foundation, Inc., Illinois Carry and
Illinois State Rifle Association

Law Firm of David G. Sigale, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547/630.596.4445
dsigale@sigalelaw.com

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,608 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b), and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word 2016 in 14 point Century font.

     /s/ David G. Sigale
David G. Sigale

Attorney for Plaintiffs-Appellants

Dated: January 28, 2016

**☑**

# CERTIFICATE OF SERVICE
### Certificate of Service When All Case Participants Are CM/ECF Participants

I hereby certify that on ____January 28, 2016____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ ____David G. Sigale____

☐

# CERTIFICATE OF SERVICE
### Certificate of Service When Not All Case Participants Are CM/ECF Participants

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                          address:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

s/_____

# REQUIRED SHORT APPENDIX

## TABLE OF CONTENTS

CIRCUIT RULE 30(d) STATEMENT ................................................ i

DISTRICT COURT OPINION ..................................................... SA.1

CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) are included in the required short appendix. All materials required by Circuit Rule 30(b) are included in the separate appendix pursuant to Circuit Rule 30(b)(7),

/s/ David G. Sigale

David G. Sigale

E-FILED
Monday, 07 December, 2015  11:40:25 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| KEVIN W. CULP, MARLOW DAVIS, FREDDIE REED-DAVIS, DOUGLAS W. ZYLSTRA, JOHN S. KOLLER, STEVE STEVENSON, PAUL HESLIN, MARLIN MANGELS, JEANELLE WESTROM, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS CARRY, and ILLINOIS STATE RIFLE ASSOCIATION, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs | ) ) |
| v. | ) )   No. 14-CV-3320 |
| LISA MADIGAN, in her Official Capacity as Attorney General of the State of Illinois; LEO P. SCHMITZ, in his Official Capacity as Director of the Illinois State Police, and JESSICA TRAME, as Bureau Chief of the Illinois State Police Firearms Services Bureau, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

### OPINION

**SUE E. MYERSCOUGH, U.S. District Judge.**

This cause is before the Court on Plaintiffs' Motion for

Preliminary Injunction (d/e 17). On October 16, 2015, the Court

SA 1

held a hearing on the Motion.  Following the hearing, the Court took the matter under advisement.

The Motion is DENIED.  Although Plaintiffs have met the threshold requirements for a preliminary injunction, the balance of the harms and consideration of the public interest favor denying the request for a preliminary injunction.

## I. PROCEDURAL BACKGROUND

In October 2014, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief.  Compl. (d/e 1).  Plaintiffs allege that Section 40 of the Illinois Firearm Concealed Carry Act (430 ILCS 66/40) and all other statutory language that restricts otherwise-qualified nonresidents of Illinois the rights and privileges of carrying concealed firearms based solely on their state of residence violate Plaintiffs' Second Amendment rights, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Privileges and Immunities Clause of Article IV, § 2, and the Due Process Clause of the Fourteenth Amendment.  See id., Counts I-IV. Currently, the Firearm Concealed Carry Act allows nonresidents to obtain an Illinois concealed carry license only if the nonresident is a

Page **2** of **64**

resident of a state or U.S. Territory with laws related to firearm ownership, possession, and carrying that are substantially similar to Illinois' requirements.  The Illinois State Police (ISP) has found that only four states have substantially similar laws: Hawaii, New Mexico, South Carolina, and Virginia.

The named Plaintiffs include nine individuals who work in or visit Illinois, hold concealed carry licenses in their resident states, and wish to carry concealed weapons in Illinois. The individual Plaintiffs are residents of Colorado, Indiana, Iowa, Missouri, Pennsylvania, and Wisconsin.

The named Plaintiffs also include three associations—the Second Amendment Foundation, Inc., Illinois Carry, and the Illinois State Rifle Association—whose members include non-Illinois residents who wish to obtain Illinois concealed carry licenses but do not have a concealed carry license from a state approved by the ISP. Plaintiffs assert that they (or their members) would apply for a concealed carry permit if able and would carry concealed firearms in Illinois but fear prosecution.  Compl. ¶¶ 21, 23, 25, 27; see also

720 ILCS 5/24-1 (unlawful use of weapons statute); 720 ILCS 5/24-1.6 (aggravated unlawful use of a weapon statute).

Plaintiffs have sued three defendants in their official capacity. Plaintiffs sue Attorney General Lisa Madigan, who Plaintiffs assert is responsible for executing and administering the laws of the State of Illinois, including the Firearm Concealed Carry Act.  Also named as a defendant is Leo P. Schmitz[1], the Director of the ISP, who is responsible for executing and administering the Firearm Concealed Carry Act.  Finally, Plaintiffs sue Jessica Trame, the Bureau Chief of the ISP Firearms Services Bureau, who is the ISP employee directly responsible for the administration of the Firearm Concealed Carry Act.  See Compl. ¶¶ 29-31 (d/e 1); Defs. Answer ¶¶ 29-31 (d/e 13).

In the Complaint, Plaintiffs seek a declaratory judgment that Section 40 of the Firearm Concealed Carry Act and all other Illinois statutory language that restrict qualified nonresidents of Illinois

---

[1] Plaintiffs originally sued Hiram Grau in his official capacity as the Director of ISP.  Since the filing of the lawsuit, Leo P. Schmitz has replaced Grau as Director.  Therefore, pursuant to Federal Rule of Civil Procedure 25(d), Schmitz is substituted for Grau as a party defendant.

from carrying a concealed firearm based solely on their states of residence are null and void.  Compl., Prayer for Relief ¶ 2(a). Plaintiffs also ask that the Court issue preliminary and permanent injunctions against Defendants barring enforcement of Section 40 of the Firearm Concealed Carry Act and all other Illinois statutory language that restrict otherwise-qualified nonresidents of Illinois from carrying concealed firearms based solely on their states of residence.  Id. ¶ 2(b).

On August 7, 2015, Plaintiffs filed the Motion for Preliminary Injunction (d/e 17) at issue herein.  In the Motion, Plaintiffs ask the Court to preliminarily enjoin Defendants from enforcing the nonresident application ban contained in Section 40 of the Firearm Concealed Carry Act against Plaintiffs and/or their members. Motion ¶ 1.  Plaintiffs also ask that Defendants be preliminarily enjoined from enforcing any other sections of the Illinois Compiled Statutes which restrict the firearm rights and privileges of nonresidents of Illinois based solely on their states of residence.  Id. ¶ 2.

## II. RELEVANT ILLINOIS LAW REGARDING THE POSSESSION AND CARRYING OF FIREARMS

Two Illinois statutes govern this dispute: the Firearm Owners Identification Card Act (430 ILCS 65/0.01 et seq.,) (FOID Act) which permits qualified individuals to possess firearms, and the Firearm Concealed Carry Act (430 ILCS 66/1 et seq.), which permits qualified individuals to carry concealed handguns in public. Because nonresident applicants for a concealed carry license must meet all of the requirements for a FOID card except residency, the FOID Act is addressed first.

### A.   The FOID Act Regulates the Possession of Firearms in Illinois

Illinois regulates the possession of firearms through the FOID Act.  The FOID Act generally prohibits a person from possessing a firearm in Illinois unless the person has a FOID card.  430 ILCS 65/2(a).

One of the requirements for obtaining a FOID card is that the applicant must be a resident of Illinois.  See 430 ILCS 65/4 (a)(2)(xiv) (requiring that each applicant for a Firearm Owner's Identification Card submit evidence to the ISP that "[h]e or she is a

resident of the State of Illinois"). The FOID Act makes exceptions for law enforcement officers, armed security officers in Illinois, and United States Military personnel permanently assigned in Illinois. See 430 ILCS 65/4(a-10) (providing that a FOID applicant "who is employed as a law enforcement officer, an armed security officer in Illinois, or by the United States Military permanently assigned in Illinois and who is not an Illinois resident" must submit a driver's license or identification card number from their resident states); 430 ILCS 65/8(q) (providing that the ISP has the authority to deny a FOID card to nonresidents of Illinois except as provided in 430 ILCS 65/4(a-10)).

In addition, the FOID Act contains exceptions that allow nonresidents to possess a firearm in Illinois without a FOID card, including nonresidents who are currently licensed or registered to possess a firearm in their resident states (430 ILCS 65/2(b)(10)); certain nonresident hunters (430 ILCS 65/2(b)(5), (13)); nonresidents while on a firing or shooting range (430 ILCS 65/2(b)(7)); nonresidents while at a firearm showing or display recognized by the ISP (430 ILCS 65/2(8)); and nonresidents whose

Page **7** of **64**

firearms are unloaded and enclosed in a case (430 ILCS 65/2(9)).
See also Mishaga v. Schmitz, No. 10-cv-03187, 2015 WL 5731653
(C.D. Ill. Sept. 30, 2015) (finding the non-Illinois resident plaintiff
lacked standing to seek an order declaring the FOID Act
unconstitutional because she did not face a credible threat of
prosecution; the FOID Act permitted the plaintiff to possess a
functional firearm in the home of her Illinois-resident friend).

Further, an application for a FOID card may be denied or
revoked based on the applicant's criminal or mental health history
(among other reasons not relevant to the issues herein).  See
generally 430 ILCS 65/8; see also 430 ILCS 65/4 (requiring that an
applicant submit evidence to the ISP that he meets the
qualifications for obtaining a FOID card).  Grounds for denial
include that the applicant has been convicted of a felony (740 ILCS
65/8(c)); has been convicted within the past five years of battery,
assault, aggravated assault, violation of an order of protection, or a
substantially similar offense in another jurisdiction in which a
firearm was used or possessed (430 ILCS 65/8(k)); has been
convicted of domestic battery, aggravated domestic battery, or a

Page **8** of **64**

substantially similar offense in another jurisdiction before, on, or after January 1, 2012 (the effective date of Public Act 97-158, amending Section 8) (430 ILCS 65/8(l)); or is prohibited under Illinois state statute or federal law from acquiring or possessing a firearm or ammunition (430 ILCS 65/8(n)).[2]

In addition, the application may be denied or the license revoked if the person has been a patient in a mental health facility within the past five years (430 ILCS 65/8(e)); has been a patient in a mental facility more than five years ago and has not received a certification[3] from a qualified examiner that he is not a clear and present danger to himself or others (Id.); has a mental condition of such a nature that it poses a clear and present danger to the

---

[2] Those prohibited by federal law from possessing a firearm include those convicted of a crime punishable by imprisonment for a term exceeding one year; persons adjudicated as a mental defective or who have been committed to a mental institution; and persons convicted in any court of a misdemeanor crime of domestic violence.  See 18 U.S.C. § 922(g)(1), (g)(4), (g)(9).

[3] See 430 ILCS 65/8(u) (requiring that an person who had his FOID card revoked or denied because he was a patient in a mental health facility shall not be permitted to obtain a FOID card after the 5-year period has lapsed unless he receives a mental health evaluation and a certification that he is not a clear and present danger to himself or others); Mental Health Certification for Firearm Possession form, available at https://ispfsb.com/Public/Firearms/FOID/mentalhealthcert.pdf (all websites last visited December 4, 2015).

applicant or other person or the community (430 ILCS 65/8(f)); or

has been adjudicated a mentally disabled person (430 ILCS

65/8(r)).

The FOID Act also contains a reporting mechanism that allows

the ISP to monitor the ongoing qualifications of FOID card holders.

See 430 ILCS 65/8.1.  For example, under the FOID Act, the Illinois

circuit court clerks must notify the ISP of certain criminal arrest,

charge, and disposition information.  See 430 ILCS 65/8.1(a)

(requiring the circuit clerk to notify the ISP "of all final dispositions

of cases for which [the ISP] has received information reported to it

under Sections 2.1 and 2.2 of the Criminal Identification Act"); see

also 20 ILCS 2630/2.1 (requiring the clerk of the circuit court,

Illinois Department of Corrections, sheriff of each county, and

state's attorney of each county to submit certain criminal arrest,

charge, and disposition information to the ISP); 20 ILCS 2630/2.2

(requiring the circuit court clerk to report to the ISP's Firearm

Owner's Identification Card Office convictions for certain violations

of the Criminal Code when the defendant has been determined to be

subject to the prohibitions of 18 U.S.C. 922(g)(9)).[4]  In addition, a court that adjudicates an individual as a mentally disabled person or finds that a person has been involuntarily admitted must direct the circuit court clerk to notify the ISP's FOID department and forward a copy of the court order to the ISP.  430 ILCS 65/8.1(b).

In addition, the FOID Act requires that the Department of Human Services (DHS) report to the ISP all information collected under subsection (b) of Section 12 of the Mental Health and Developmental Disabilities Confidentiality Act[5] "for the purpose of determining whether a person who may be or may have been a

---

[4] Providing that a person convicted of a misdemeanor crime of domestic violence cannot possess a firearm.  18 U.S.C. § 922(g)(9).

[5] Section 12(b) of the Mental Health and Developmental Disabilities Confidentiality Act provides that all physicians, clinical psychologists, and qualified examiners must provide notice directly to DHS or his or her employer (who shall then notify DHS) within 24 hours of determining a person poses a clear and present danger to himself, herself, or others, or within 7 days after a person 14 years or older is determined to be a person with a developmental disability as described in Section1.1 of the FOID Act.  Notice of an admission of a patient—which includes a person who voluntarily receives mental health treatment as an inpatient or resident or who receives mental health treatment as an outpatient and who poses a clear and present danger to himself, herself, or to others—must be furnished to DHS within 7 days of admission.  DHS and all public or private hospitals and mental health facilities shall furnish to ISP only that information that may be required for determining whether an individual should be disqualified from receiving or retaining a FOID card.  740 ILCS 110/12(b); see also 430 ILCS 65/1.1 (defining "patient").

patient in a mental health facility is disqualified under State or federal law from receiving or retaining a Firearm Owner's Identification Card, or purchasing a weapon."  430 ILCS 65/8.1(c). Similarly, every physician, clinical psychologist, or qualified examiner who determines that a person poses a clear and present danger to himself or others must notify DHS within 24 hours of that determination.  430 ILCS 65/8.1(d)(1).  Further, a law enforcement official or school administrator who determines a person poses a clear and present danger to himself or others must notify the ISP within 24 hours of that determination.  430 ILCS 65/8.1(d)(2).  DHS must also update its records and, "if appropriate," notify the ISP. 430 ILCS 65/8.1(d).

## B.  The Firearm Concealed Carry Act Regulates the Carry of Concealed Weapons in Illinois

Illinois also provides a mechanism for individuals to carry a concealed firearm in Illinois by way of the Firearm Concealed Carry Act.  430 ILCS 66/1 et seq.  Illinois is a "shall issue" state, meaning that the ISP must issue a license if the applicant meets the qualifications, provides the application and documentation

Page **12** of **64**

required, submits the requisite fee, and does not pose a danger to himself or a threat to public safety as determined by the Carry Licensing Review Board.  430 ILCS 66/10(a).  The license is valid for five years and allows the licensee to carry a loaded or unloaded concealed or partially concealed firearm on or about his person and within a vehicle.  430 ILCS 66/10(c).

To qualify for a concealed carry license, the applicant must be at least 21 years of age; have a valid FOID card and, at the time of the application, meet the requirements for the issuance of a FOID card; have not been in residential or court-ordered treatment for alcoholism, alcohol detoxification, or drug treatment within five years immediately preceding the date of the application; and have completed firearms training.  430 ILCS 66/25(1), (2), (6).

In addition, the Firearm Concealed Carry Act imposes additional requirements relating to the applicant's criminal history. The applicant must not have been convicted or found guilty in any state of a misdemeanor involving the use or threat of physical force or violence to any person within five years preceding the date of the application or have two or more violations relating to driving while

Page **13** of **64**

under the influence of drugs or alcohol within five years preceding

the date of the application.  430 ILCS 66/25(3).  Moreover, the

applicant must not be the subject of a pending arrest, warrant,

prosecution, or proceeding for an offense or action that could lead

to disqualification to own or possess a firearm.  430 ILCS 66/25(4).

The Firearm Concealed Carry Act requires that ISP conduct

background checks of the applicants for concealed carry licenses.

430 ILCS 66/35.  The background check must consist of a search

of the following: the Federal Bureau of Investigation's National

Instant Criminal Background Check System (NICS)[6]; all available

state and local criminal history record information files, including

records of juvenile adjudications; all available federal, state, and

local records regarding wanted persons, domestic violence

restraining orders, and protective orders; DHS files relating to

mental health and developmental disabilities; and all other available

---

[6] According the FBI website, NICS is a "national system that checks available records on persons who may be disqualified from receiving firearms." https://www.fbi.gov/about-us/cjis/nics/general-information/fact-sheet. "The NCIS is a computerized background check system designed to respond within 30 seconds on most background check inquiries so the [Federal Firearms Licensees] receive an almost immediate response."  Id.

records of any federal, state, local agency, or other public entity

likely to contain information relevant to whether the applicant is

prohibited from purchasing, possessing, or carrying a firearm.  430

ILCS 66/35 (also providing that the ISP may charge applicants for

conducting the criminal history records check but that the fee shall

not exceed the actual cost of the records check).

The specific statutory provision Plaintiffs challenge here,

Section 40 of the Firearm Concealed Carry Act, governs nonresident

concealed carry license applications.  Specifically, this section of the

Firearm Concealed Carry Act directs ISP to by rule allow for

nonresident license applications from any state or territory of the

United States with laws related to firearm ownership, possession,

and carrying "that are substantially similar to the requirements to

obtain a license under" the Firearm Concealed Carry Act.  430 ILCS

66/40(b).  The ISP currently defines substantially similar as:

> The comparable state regulates who may carry firearms,
> concealed or otherwise, in public; prohibits all who have
> involuntary mental health admissions, and those with
> voluntary admissions within the past 5 years, from
> carrying firearms, concealed or otherwise, in public;
> reports denied persons to NICS; and participates in
> reporting persons authorized to carry firearms, concealed

or otherwise, in public through NLETs [sic] [(the National
Law Enforcement Telecommunications System)].

20 Ill. Admin. Code 1231.10.  According to the ISP's website, only

four states have substantially similar laws: Hawaii, New Mexico,

South Carolina, and Virginia.  See 20 Ill. Adm. Code 1231.110(c)

(providing that the ISP shall determine which states are

substantially similar); 20 Ill. Adm. Code 1231.110(b)(providing that

ISP "shall post on its website a list of all states determined to be

substantially similar"); https://www.ispfsb.com/Public/Faq.aspx

(listing the four states with substantially similar laws—Hawaii, New

Mexico, South Carolina, and Virginia).

   The nonresident applicant must meet all of the requirements

contained in section 25 of the Firearm Concealed Carry Act, except

for the Illinois residency requirement.  430 ILCS 66/40(c).  The

nonresident applicant must submit a notarized document affirming

that he is eligible to own or possess a firearm under federal law and

the laws of his state or territory of residence; that, if applicable, he

has a license or permit to carry a firearm, concealed or otherwise,

issued by his state; that he understands Illinois law pertaining to

Page **16** of **64**

the possession and transport of firearms; and acknowledging that he is subject to the jurisdiction of the ISP and Illinois courts for any violation of the Firearm Concealed Carry Act.  Id.

The Firearm Concealed Carry Act specifically provides that nothing in the Act prohibits a nonresident from transporting a concealed firearm in his or her vehicle if the concealed firearm remains in the vehicle and the nonresident: is not prohibited from owning a firearm under federal law; is eligible to carry a firearm in public under the laws of his state of residence; and is not in possession of a license under the Firearm Concealed Carry Act. 430 ILCS 66/40(e).  If the vehicle is unattended, however, the firearm must be stored within a locked vehicle or a locked container.  Id.

The Firearm Concealed Carry Act imposes an additional reporting obligation.  Section 105 requires that school administrators report to the ISP when a student of a public or private elementary school, secondary, school, community college, college, or university is determined to pose a clear and present danger to himself or others within 24 hours of such determination.

430 ILCS 66/105 (but not indicating who makes that determination).

### III. DEFENDANTS' JUSTIFICATION FOR THE RESIDENCY REQUIREMENT

Defendants support the residency requirement of the Firearm Concealed Carry Act with the Affidavit of Defendant Trame, the Bureau Chief of the ISP Firearms Services Bureau.  Trame explains the difficulty of verifying nonresident applicants' identities, criminal history, mental health information, and obtaining updated nonresident information necessary to revoke a concealed carry license.

According to Trame, the Firearms Services Bureau performs an extensive background check on each applicant for a concealed carry license. Trame Aff. ¶ 4.  This background check process is intended to ensure public safety by identifying persons who are unqualified to carry firearms.  Id. ¶ 8.

The background check includes queries of the national

systems such as the National Crime Information Center (NCIC),[7]

NICS, the Interstate Identification Index,[8] Immigration and Customs

Enforcement, and NLETS.  The Bureau also checks the Illinois

systems, including the Criminal History Record Information system,

driver's license or identification systems maintained by the

Secretary of State, and the Computerized Hot Files system, which is

"a central online repository for numerous officer and public safety

information repositories" that is maintained by the ISP.  Trame Aff.

¶ 6.  In addition, the applicant's information is made available to

Illinois law enforcement agencies, which may submit an objection to

a concealed carry license applicant.  Trame Aff. ¶ 7; see also 430

---

[7] This is the mechanism criminal justice agencies use to access over 13 million active records.  The NCIC database consists of 21 files, including 14 "persons" files such as the National Sex Offender Registry, Foreign Fugitives, Immigration Violations, Orders of Protection, and Wanted Persons.  See Trame Aff. ¶ 13. "The NCIC has operated under a shared management concept between the FBI and federal, state, local, and tribal criminal justice users since its inception." https://www.fbi.gov/about-us/cjis/ncic.

[8] The Interstate Identification Index is the national criminal history record system.  See Trame Aff. ¶ 13.  Thirty-two states participate only in the Interstate Identification Index while 19 participate in Interstate Identification Index and the National Fingerprint File.  https://www.fbi.gov/about-us/cjis/cc/quick-links-to-maps/IIImaps.

ILCS 66/15 (providing that any law enforcement agency may
submit an objection to a license applicant); 430 ILCS 66/5 (defining
law enforcement agency to include "any federal, State, or local law
enforcement agency, including offices of State's Attorneys and the
Office of the Attorney General").

**A.    Defendants Identify the Difficulties in Verifying
        Nonresident Applicant's Identities**

Trame states that the ISP does not have direct access to other
states' driver's license, state ID, or similar databases.  Therefore, to
verify a nonresident's identity, the Firearm Services Bureau must
rely on NLETS to check the validity of an out-of-state driver's
license.  Trame Aff. ¶ 10.  Currently, the ISP is not able to receive
identifying photographs or signatures from NLETS but has
contracted for development of a system that would allow the ISP
access to such information.  Arizona, California, Colorado, Kansas,
New York, New Hampshire, Oklahoma, South Carolina, and the
District of Columbia do not currently make images available to
NLETS.  Id.

**B.    Defendants Identify the Difficulties in Verifying Nonresident Criminal History**

For Illinois residents, the Firearm Services Bureau is able to locate criminal history through Illinois' Criminal History Record Inquiry, a system maintained by ISP, the Computerized Hot Files, and from federal systems.  Because the Bureau does not have direct access to other states' local or state criminal history databases, the Bureau relies on federal databases to obtain criminal history information on nonresidents.  Trame Aff. ¶ 12.

Trame indicates, however, that many states provide the federal databases with only a summary of an arrest.  This information is often inadequate to assess an applicant's eligibility for a concealed carry license.  Id.    Although the ISP may request a criminal record if the federal database is incomplete, many jurisdictions charge for records, and ISP does not have funds appropriated to pay for any records.  Id.

The ISP uses NLETS to determine whether a nonresident applicant's state-issued concealed carry license is valid and to check the continued validity of the home-state issued concealed

Page **21** of **64**

carry license every 90 days.  Trame Aff. ¶ 13.  The ISP is unable to

obtain accurate and updated information via NLETS for residents

from states that do not fully participate in those systems.  Id. ¶ 14

(ISP is also unable to obtain accurate and updated information via

NCIC for those states that do not fully participate in NCIC).

In addition, information from the Interstate Identification

Index may be limited because states are not uniform in their

reporting of different levels and types of offenses. Id. ¶ 15.   Only

the National Fingerprint File provides detailed extracts directly from

states' local databases.  Id.  However, as of August 2015, only 19

states participate in the NFF: Colorado, Florida, Georgia, Hawaii,

Idaho, Iowa, Kansas, Maryland, Minnesota, Missouri, Montana,

North Carolina, New Jersey, Ohio, Oklahoma, Oregon, Tennessee,

West Virginia, and Wyoming.  Id.

## C.  Defendants Identify the Difficulties in Verifying Nonresident Mental Health Information

Through the Illinois DHS FOID Mental Health System, the

Firearm Services Bureau can access information on Illinois mental

health facility admissions and determine whether an individual has

been involuntarily admitted into a mental health facility in Illinois or been a patient in a mental health facility in Illinois within the past five years or more.  Trame Aff. ¶ 17.  This System does not, however, contain records on out-of-state mental health facility admissions.  Id. ¶ 18.  In addition, the ISP does not have access to other states' mental health facility admission databases, to the extent the other states may have them.  Id.

Trame states that, in her experience, federal databases contain only limited information regarding involuntary mental health admissions or mental disability adjudications and do not contain voluntary mental health admission information.  Trame Aff. ¶ 19. To search for mental health information regarding nonresidents, the ISP is limited to information available through the NICS Index, but not all states participate in the NICS Index.  Id. ¶ 20.  NICS contains information from participating states regarding individuals prohibited from firearm possession for mental health reasons under

18 U.S.C. § 922(g)(4)[9] but again does not provide any information on voluntary mental health admissions.  Id.

## D. Defendants Identify the Difficulties in Obtaining Updated Nonresident Information Necessary to Revoke a Concealed Carry License

Trame states that all resident concealed carry license holders are checked against the Illinois Criminal History Record Inquiry and DHS Mental Health Systems (by virtue of their FOID card) for any new conditions that would disqualify them from holding a FOID card or a concealed carry license.  Trame Aff. ¶ 21.  All concealed carry license holders, both resident and nonresident, are checked against the federal databases on a quarterly basis.  Id.

Trame explains in her affidavit why it is difficult for the Firearm Services Bureau to obtain updated nonresident information relevant to revoking a concealed carry license.  Trame claims that, while Illinois physicians, Illinois school administrators, Illinois circuit clerks, and DHS are required to report certain mental health information to the ISP, no such requirement is imposed on out-of-

---

[9] This statute provides that it is unlawful for any person who has been adjudicated as a mental defective or who has been committed to a mental institution from possessing a firearm or ammunition.  18 U.S.C. § 922(g)(4).

state physicians, administrators, and circuit clerks to report information to the ISP.  Trame Aff. ¶ 22.  Moreover, daily checks of the DHS Mental Health Systems would not reveal information concerning persons in other states.  Id.

The ISP can request information from out-of-state mental health entities, but many of the out-of-state mental health entities do not provide mental health information even after an ISP request. Id. ¶ 24.  According to Trame, the ISP's lack of access to this type of data held by other states would make it virtually impossible to effectively conduct the level of screening and monitoring on nonresident concealed carry license applications that is performed on resident applicants.  Id. ¶

## E.   Illinois Surveyed Other States to Determine Whether the Other States Have Substantially Similar Laws Regulating Firearms

In 2013, the ISP sent surveys to the 49 other states and the District of Columbia requesting information regarding their regulation of firearms use.  The survey sought information on each state's reporting and tracking mechanisms relative to criminal activity and mental health issues for the purpose of determining if

Page **25** of **64**

the other states' laws were substantially similar to Illinois' law.  In

2014, the ISP sent a second survey to those states who did not

respond to the first survey.  Most states and the District of

Columbia eventually responded but for seven states:  Colorado,

Maine, Maryland, Massachusetts, Nevada, Pennsylvania, and Rhode

Island.  The survey asked:

1.   Does your state issue a Concealed Carry License?

2.   Does your state participate in reporting Concealed
     Carry Licenses via the National Law Enforcement
     Teletype System (NLETS)?

3.   Does your state report all involuntary (or
     adjudicated) mental health admissions to the
     National Instant Criminal Background Check
     System (NICS)?

4.   Does your state prohibit the use or possession of
     firearms based on a voluntary mental health
     admission within the last five years?

5.   Does your state have a mechanism to track or
     report voluntary mental health admissions for the
     purpose of revoking or approving a concealed carry
     license?

6.   If you answered "No" to questions 4 or 5, is there
     pending legislation that addresses the concern of
     mental health admissions with regards to
     possession of firearms?

<u>See</u> Trame Aff., Ex. C (d/e 23-3).

Based on these two surveys (and, according to defense counsel at the hearing, the receipt of additional information), the ISP determined that four states had laws similar to Illinois that regulate who may carry firearms in public, report persons authorized to carry through NLETS, report denied persons through NICS, prohibit persons voluntarily admitted to a mental health facility in the last five years from possessing or using firearms, and prohibit persons involuntarily admitted to mental health facilities from possessing or using firearms.  Trame Aff. ¶ 28.  These states were Hawaii, New Mexico, South Carolina, and Virginia.  <u>Id.</u>

Trame states that the Firearm Services Bureau would not have the time or resources to properly research the necessary information for nonresident applicants if all such nonresidents could apply for a concealed carry license.  Trame Aff. ¶ 30.  The Firearm Concealed Carry Act requires that the ISP either approve or deny an application within as few as 90 days from the date received, subject to certain exceptions.  <u>Id.</u>  To process applications this quickly, Trame believes it is likely that the out-of-state

applicants would not be held to the same standards set forth in the

FOID Act or the Firearm Concealed Carry Act as Illinois residents

are held.  Id.  Otherwise, applications would have to be approved

without a complete and thorough background check.  Id.

Applicants residing in states that lack reporting and eligibility

requirements similar to Illinois and who are issued licenses under

the Firearm Concealed Carry Act cannot be held to the same

monitoring standards (notification of mental health issues or a

subsequent felony conviction that would disqualify the person from

possessing/carrying a firearm) necessary to ensure continued

eligibility due to the lack of, or an inability to obtain—either at all or

in a timely manner—information concerning those nonresidents.

Id.

## IV. PLAINTIFFS HAVE STANDING TO BRING THIS SUIT

Defendants do not object to Plaintiffs' standing.  However,

standing is jurisdictional and is not subject to waiver.  Freedom

From Religion Found., Inc. v. Nicholson, 536 F.3d 730, 737 (7th

Cir. 2008).

The individual Plaintiffs include the following nine individuals. Plaintiff Kevin W. Culp is an Air Force Colonel stationed on orders at Scott Air Force Base near Belleville, Illinois, but he is a legal resident of Pennsylvania.  Culp possesses a license to carry a concealed weapon from Pennsylvania and Florida.  Culp is also a Basic Pistol Instructor and meets the qualifications to be an Illinois concealed carry licensing instructor.

Marlow Davis is a resident of Wisconsin. Davis is retired and spends approximately one-half of his time in Chicago.  Davis holds a Wisconsin license to carry a concealed weapon.

Freddie Reed-Davis, the wife of Marlow Davis, is also a resident of Wisconsin.  Reed-Davis is a nurse working in Chicago. Reed-Davis holds a Wisconsin license to carry a concealed weapon.

Douglas W. Zylstra is a resident of Indiana.  He possesses an Indiana license to carry a concealed weapon, a Utah concealed carry license, and an instructor certification from Utah.  Zylstra is an ISP concealed carry instructor working for a firearm training company in Lansing, Illinois.

John S. Koller is a resident of Colorado.  He holds a license to carry a concealed weapon from Colorado, Utah, Nevada, and Arizona.  Koller was born and raised in Chicago and visits family in the Chicago area.  He also makes periodic business trips to Illinois.

Steve Stevenson is also a resident of Colorado.  Stevenson holds concealed carry licenses from Colorado and Utah.  Stevenson occasionally traverses Illinois on I-80 and I-88 to visit relatives in Illinois and Michigan.

Paul Heslin is a resident of Missouri.  He holds a Missouri and Florida license to carry a concealed weapon and a Type 03 federal firearms license.[10]  He is also an Illinois certified concealed carry instructor.

Marlin Mangels is a resident of Iowa.  Mangels possesses a concealed carry license from Iowa, Utah, and Arizona.  Mangels frequently rides his bicycle up the River Road in Illinois, eats in restaurants in Hamilton, Illinois, travels to see his wife's family in

---

[10] This is a Collector of Curios and Relics license. 18 U.S.C. § 923(b); see https://www.atf.gov/firearms/listing-federal-firearms-licensees-ffls-2015

the Chicago area, and travels I-80 through Illinois to visit friends in Massachusetts.

Jeanelle Westrom is a resident of Iowa.  Westrom possesses a license to carry a concealed weapon from Iowa and Georgia.  She has a firearms business in Iowa and a separate firearms business in Geneseo, Illinois, where she spends a considerable amount of her time.  Westrom also has three federal firearms licenses that are required for her businesses.

The individual Plaintiffs are licensed to possess concealed handguns in their states of residence.  The individual Plaintiffs are prohibited by Section 40 of the Firearm Concealed Carry Act from applying for and obtaining Illinois concealed carry licenses because their states of residence are not approved for applications for concealed carry licensing by Defendants. The individual Plaintiffs would carry a loaded and functional concealed handgun in public for self-defense but refrain from doing so because they fear arrest, prosecution, fine, and imprisonment.

The named Plaintiffs also include several organizations.  The individual Plaintiffs are members of these organizations.

Page **31** of **64**

The organizations include the Second Amendment Foundation, Inc. (SAF), a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. The purposes of SAF include education, research, publishing, and legal action focusing on the Constitutional right to own and possess firearms.

SAF brings this action on behalf of itself and its members. SAF has over 650,000 members and supporters nationwide.  SAF's membership includes nonresidents of Illinois who wish to obtain Illinois concealed carry licenses but do not have a concealed carry license from a state approved by the ISP.  These members would carry a loaded and functional concealed handgun in public for self-defense but refrain from doing so because they fear arrest, prosecution, fine, and imprisonment.

Illinois Carry is a non-profit membership organization incorporated under the laws of Illinois with its principal place of business in Shelbyville, Illinois.  Illinois Carry is dedicated to the preservation of Second Amendment rights.  Illinois Carry's purposes

include education and supporting and defending the people's right to keep and bear arms.

Illinois Carry has over 10,000 members and supporters in Illinois and many members outside the State of Illinois.  Members of Illinois Carry who are not residents of Illinois and do not have a concealed carry license from an approved state are prohibited from applying for and obtaining an Illinois concealed carry license. Those members would carry a loaded and functional concealed handgun in public for self-defense but refrain from doing so because they fear arrest, prosecution, fine, and imprisonment.

The Illinois State Rifle Association is a non-profit membership organization incorporated under the laws of Illinois with its principal place of business in Chatsworth, Illinois.  The Illinois State Rifle Association has over 17,000 members and supporters in Illinois, and many members outside the State of Illinois.  The purposes of the Illinois State Rifle Association include securing the Constitutional right to privately own and possess firearms in Illinois through education, outreach, and litigation.  The Illinois State Rifle Association brings this action on behalf of itself and its members.

Page **33** of **64**

Members of the Illinois Rifle Association who are not residents of Illinois and do not have concealed carry licenses from an approved state are prohibited from applying and obtaining an Illinois concealed carry license.  However, those members would carry a loaded and functional concealed handgun in public for self-defense but do not do so because they fear arrest, prosecution, fine, and imprisonment.

"Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; the injury is caused by the defendant's acts; and a judicial decision in the plaintiff's favor would redress the injury." See Ezell v. City of Chi., 651 F.3d 684, 695 (7th Cir. 2011) (quoting Bauer v. Shepard, 620 F.3d 704, 708 (7th Cir. 2010)) (internal quotation marks omitted).

In this case, Plaintiffs characterize the statute as imposing a complete ban on qualified nonresidents in 45 states, Washington, D.C., and U.S. territories from publicly carrying firearms while Illinois residents and those nonresidents from a few states are not so banned.  According to Plaintiffs, this statute violates their Second Amendment right to keep and bear arms, as well as their

Page **34** of **64**

rights under the Equal Protection Clause of the Fourteenth Amendment, the Privileges and Immunities Clause of Article IV of the Constitution, and the Fourteenth Amendment Due Process Clause. Because the individual Plaintiffs allege that they have suffered an actual injury caused by Defendants' acts (enforcement of the statute), the individual Plaintiffs have alleged causation and injury. Moreover, a decision enjoining the enforcement of Section 40 of the Firearm Concealed Carry Act would redress the individual Plaintiffs' injury. Therefore, the individual Plaintiffs have satisfied the requirement that a judicial decision in their favor would redress their injury. Although the individual Plaintiffs did not apply for a concealed carry permit, this fact does not deprive them of standing because the residency requirement in the statute demonstrates that the permit would not have been granted even had they applied. See, e.g., Sporhase v. Neb., ex rel. Douglas, 458 U.S. 941, 944 n.2 (1982) (finding that the appellants' failure to submit an application did not deprive them of standing to challenge the reciprocity requirement because they would not have been granted a permit had they applied for one).

The organizational Plaintiffs also have standing. The SAF,
Illinois Carry, and the Illinois Rifle Association allege that they have
members who are not residents of Illinois and who do not have
concealed carry licenses from an approved state.  These members
want to carry loaded and functional concealed handguns in public
in Illinois for self-defense but do not do so because they fear arrest,
prosecution, fine, and imprisonment.  These organizations meet the
requirements for association standing because: "(1) their members
would otherwise have standing to sue in their own right; (2) the
interests the associations seek to protect are germane to their
organizational purposes; and (3) neither the claim asserted nor the
relief requested requires the participation of individual association
members in the lawsuit." Ezell, 651 F.3d at 696 (citing United Food
& Commercial Workers Union Local 751 v. Brown Grp., 517 U.S.
544, 553 (1996); Hunt v. Wash. State Apple Adver. Comm'n, 432
U.S. 333, 343 (1977); Disability Rights Wis., Inc. v. Walworth Cnty.
Bd. of Supervisors, 522 F.3d 796, 801–02 (7th Cir. 2008)).

# V. ANALYSIS

As noted above, Plaintiffs seek a preliminary injunction enjoining Defendants from enforcing against Plaintiffs and/or their members the nonresident application ban contained in the Firearm Concealed Carry Act and any other laws that restrict nonresidents' firearm rights and privileges.

"A preliminary injunction is an extraordinary remedy that is available only when the movant shows clear need." Turnell v. CentiMark Corp., 796 F.3d 656, 661 (7th Cir. 2015). A party seeking to obtain a preliminary injunction must demonstrate: (1) a reasonable likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that the party will suffer irreparable harm if the injunction is not granted. See Planned Parenthood of Ind., Inc., v. Comm'n of Ind. State Dep't of Health, 699 F.3d 962, 972 (7th Cir. 2012). The threshold for establishing a likelihood of success on the merits is low. Mich. v. U.S. Army Corps of Eng'rs, 667 F.3d 765, 782 (7th Cir. 2011); see also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc., 549 F.3d 1079, 1096 (7th Cir. 2008) (noting that the party seeking a preliminary injunction

Page **37** of **64**

"must show that it has a 'better than negligible' chance of success on the merits on at least one of its claims," which is an "admittedly low requirement") (citations omitted).

If these threshold conditions are met, the district court then weighs the balance of the harm to the parties if the injunction is granted or denied.  <u>Girl Scouts of Manitou</u>, 549 F.3d at 1086.  That is, the Court must consider the irreparable harm to Plaintiffs if the preliminary injunction is wrongfully denied versus the irreparable harm to Defendants if the preliminary injunction is wrongfully granted.  <u>Turnell</u>, 796 F.3d at 662.  The Court must also consider the effects, if any, the grant or denial of the preliminary injunction would have on non-parties (the public interest).  <u>Id.</u>

In weighing the harm, the Court applies a sliding scale approach.  <u>Id.</u> That is, "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor."  <u>Roland Mach. Co. v. Dresser Indus., Inc.</u>, 749 F.2d 380, 387 (7th Cir. 1984).  This balancing test requires that the Court "exercise its discretion 'to arrive at a decision based on a subjective evaluation of

the import of the various factors and a personal, intuitive sense about the nature of the case.'" Girl Scouts of Manitou, 549 F.3d at 1086 (quoting Lawson Prods., Inc. v. Avnet, Inc., 782 F.2d 1429, 1436 (7th Cir. 1986)).  Whether to grant a preliminary injunction is within the Court's discretion.  Ashcroft v. ACLU, 542 U.S. 656, 664 (2004) (noting that the Supreme Court and appellate courts review preliminary injunctions for an abuse of discretion); but see Turnell, 796 F.3d at 662 (noting that a "district court may abuse its discretion by making a clear factual error or a mistake of law").

**A.  Plaintiffs Can Satisfy the Threshold Requirements for a Preliminary Injunction**

1.  Plaintiffs Have Demonstrated a Reasonable Likelihood of Success on the Merits of Their Second Amendment Claim

Plaintiffs argue that they can show a strong likelihood of success on the merits of their claim that Section 40 of the Firearm Concealed Carry Act violates the Second Amendment.  According to Plaintiffs, the law denies virtually all nonresidents of Illinois the fundamental Second and Fourteenth Amendment right of handgun possession available to Illinois residents.  Plaintiffs claim that the State has no interest in denying virtually all nonresidents the right

Page **39** of **64**

to handgun possession based solely on their state of residence.  As

such, Plaintiffs assert that under any level of scrutiny, the statute

must be enjoined.

The Second Amendment of the United States Constitution

provides:

> A well regulated Militia, being necessary to the security of
> a free State, the right of the people to keep and bear
> Arms, shall not be infringed.

U.S. Const. amend. II.  In <u>District of Columbia v. Heller</u>, the United

States Supreme Court held that there is a guaranteed "individual

right to possess and carry weapons in case of confrontation" based

on the Second Amendment.  <u>Heller</u>, 554 U.S. 570, 592 (2008) (also

holding that the Second Amended "codified a <u>pre-existing</u> right")

(emphasis in original).  Consequently, the Court found that the

District of Columbia's ban on handgun possession in the home

violated the Second Amendment.  <u>Id.</u> at 635.

Nonetheless, the Court recognized that the right was not

unlimited, and that:

> nothing in our opinion should be taken to cast doubt on
> longstanding prohibitions on the possession of firearms
> by felons and the mentally ill, or laws forbidding the

> carrying of firearms in sensitive places such as schools
> and government buildings, or laws imposing conditions
> and qualifications in the commercial sale of arms.

Id. at 627 (also recognizing that limits on the carrying of dangerous

and unusual weapons may be imposed).

Two years later, in McDonald v. City of Chicago, 561 U.S. 742,

750 (2010), the Supreme Court held that the Second Amendment

was fully applicable to the states through the due process clause of

the Fourteenth Amendment.  The Court noted that "the Framers

and ratifiers of the Fourteenth Amendment counted the right to

keep and bear arms among those fundamental rights necessary to

our system of ordered liberty."  Id. at 778.

Since then, the Seventh Circuit has addressed several cases

involving the Second Amendment.  See, e.g., Friedman v. City of

Highland Park, Ill., 784 F.3d 406 (7th Cir. 2015), petition for cert.

filed (finding that an ordinance that prohibited the possession of

assault weapons or large-capacity magazines did not violate the

Second Amendment); Moore v. Madigan, 702 F.3d 933, 942 (7th

Cir. 2012) (directing the district court to enter declarations that

Illinois' unlawful use of weapons and aggravated unlawful use of a

weapon statutes—which generally prohibited the carrying of guns in public in Illinois—violated the Second Amendment and to enter permanent injunctions); Ezell, 651 F.3d at 711 (finding the plaintiffs were entitled to a preliminary injunction against Chicago's firing range ban).  In each of these cases, the Seventh Circuit has explicitly or implicitly used a two-step framework to analyze the claim.  See, e.g., Friedman, 784 F.3d 406; Moore, 702 F.3d 933; Ezell, 651 F.3d at 702-03.  Under that framework, the court (1) determines whether the restricted activity is protected by the Second Amendment and (2) if so, examines the "strength of the government's justification for restricting or regulating the exercise of Second Amendment rights."  Ezell, 651 F.3d at 702-03.

Under step one, the Court must determine whether the restricted activity is protected by the Second Amendment in the first place.  Ezell, 651 F.3d at 701.  If the government can establish that the challenged firearms law regulates activity that falls outside the scope of the Second Amendment as it was understood at the relevant historical time—1791, when the Second Amendment was ratified, or 1868, when the Fourteenth Amendment was ratified—

then the analysis ends.  Ezell, 651 F.3d at 703; but see Moore, 702 F.3d at 935 (suggesting that the critical year is always 1791).  In such a case, the regulated activity is unprotected and the law is not subject to further Second Amendment review.  Ezell, 651 F.3d at 703.  If the government cannot make such a showing, either because the "historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected," then the Court must examine the second step of the framework.  Ezell, 651 F.3d at 703 (emphasis in original).  In this case, Defendants concede that the regulated conduct falls within the scope of the Second Amendment.  Defs. Mem. at 10.

Turning to the second step of the framework, the Court must inquire into the "strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." Ezell, 651 F.3d at 703.  Specifically, the Court must examine the "regulatory means the government has chosen and the public-benefits end it seeks to achieve."  Id.  The rigor of this review depends on "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right."

Page **43** of **64**

Ezell, 651 F.3d at 703; see also Ill. Ass'n of Firearms Retailers v. City of Chi., 961 F.Supp.2d 928, 935 (N.D. Ill. 2014) ("[T]he level of scrutiny applied varies according to the breadth of the challenged Second Amendment restriction").

Broad prohibitory laws restricting core Second Amendment rights are likely categorically unconstitutional.  Ezell, 651 F.3d at 703 (citing Heller and McDonald, which involved regulations that prohibited handgun possession in the home).  For other laws, however, the appropriate standard of review is somewhere between intermediate and strict scrutiny, as Heller made clear that a rational basis review was inappropriate in the Second Amendment context.  Heller, 554 U.S. at 628 n. 27 (holding that "if all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect"); Ezell, 651 F.3d at 703; but see Friedman, 784 F.3d at 410 ("But instead of trying to decide what 'level' of scrutiny applies, and how it works, inquiries that do not resolve any concrete dispute, we think it better to ask whether a regulation

bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia' [citations omitted] and whether law-abiding citizens retain adequate means of self-defense.").

When determining the appropriate level of scrutiny, courts have noted that "a severe burden on the core Second Amendment right of self-defense will require an extremely strong public interest justification and a close fit between the government's means and its end." Ezell, 651 F. 3d at 708.  In contrast, laws that restrict "activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified." Id.  "How much more easily depends on the relative severity of the burden and its proximity to the core of the right." Id.; compare United States v. Skoien, 614 F.3d 638, 643-44 (7th Cir. 2010) (en banc) (accepting the United States' concession that some form of strong showing, possibly intermediate scrutiny, applied to review law that barred persons convicted of a misdemeanor crime of domestic violence from possessing a firearm); United States v. Williams, 616 F.3d 685,

Page **45** of **64**

692 (7th Cir. 2010) (applying intermediate scrutiny to examine statute that prohibits felons from possessing guns but not deciding whether intermediate scrutiny is the precise test applicable to all challenges to gun restrictions); United States v. Yancey, 621 F.3d 681, 683 (7th Cir. 2010) (citing Skoien and Williams and evaluating whether the government made a strong showing that the statute prohibiting habitual drug abusers from possessing a firearm was substantially related to an important governmental objective but not deciding whether a different kind of regulation might require a different approach); with Ezell, 651 F.3d at 708 (applying a more rigorous showing than applied in Skoien, "if not quite 'strict scrutiny,'" where plaintiffs were law-abiding citizens, the firing range ban was not merely regulatory, and the ban seriously encroached on an important corollary to the exercise of the core right to possess firearms for self-defense); Moore, 702 F.3d at 940 (requiring something more than the level of scrutiny applied in Skoien because the gun rights of the entire law-abiding adult population of Illinois were affected by the "blanket prohibition on carrying guns in public").

Although Plaintiffs assert that Section 40 of the Firearm Concealed Carry Act fails under any standard of scrutiny, Plaintiffs also argue that the prohibition on virtually all nonresidents constitutes a severe burden on the core Second Amendment right of self-defense and violates the rights of even more law-abiding people than in the Moore case. Pls. Mem. at 16 (citing Moore, 702 F.3d at 940 (noting that the law affected "the gun rights of the entire law-abiding adult population of Illinois"). Therefore, Plaintiffs assert that a level of scrutiny akin to strict scrutiny should be applied.

Defendants argue that the conduct falls outside the core protections of the Second Amendment, which Defendants describe as the right of law-abiding citizens to use arms in defense of hearth and home. Defs. Mem. at 11. Defendants also argue that the regulated conduct is outside the core protections of the Second Amendment because the regulation implicates longstanding prohibitions that are presumptively lawful—prohibitions against possession by the criminally dangerous and mentally ill; public carriage of firearms; and possession by nonresidents. Defs. Mem. at 12. Defendants cite laws pertaining to prohibitions against

Page **47** of **64**

public carriage of firearms dating back nearly a century.  Mot. at

13.  For example, Defendants cite statutes that required obtaining a

firearm carry license in the county in which the person resides or

requiring that an individual be a resident of the state.  <u>See</u> Act of

Feb. 16, 1909, ch. 51, 1909 W. Va. Acts 394, 395-96; Act of Mar. 3,

191, ch. 74, § 5, 1919 Mont. Acts 147, 148; At of Apr. 7, 1921, § 2,

1921 Mo. Laws 692.  Accordingly, Defendants assert that

intermediate scrutiny should apply.

   Determining the correct level of scrutiny here is difficult

because, on the one hand, the regulation infringes on most

nonresidents' Second Amendment right to carry a handgun for self-

defense.[11]  Moreover, while some courts have held that the core

Second Amendment right is self-defense in the home, the Seventh

---

[11] The law is not a wholesale ban on all nonresidents, which might warrant a
different result.  <u>See</u> <u>Application of Griffiths</u>, 413 U.S. 717, 725 (1973) ("Nor
would the possibility that some resident aliens are unsuited to the practice of
law be a justification for a wholesale ban" on resident aliens practicing law in
the state); <u>Palmer v. D.C.</u>, 59 F. Supp. 3d 173, 184 (D.D.C. 2014) (finding a
total ban on carrying a handgun outside the home for self-defense was
unconstitutional under any standard of scrutiny and, enjoining "the District
from completely banning the carrying of handguns in public for self-defense by
otherwise qualified non-residents based solely on the fact that they are not
residents of the District"), <u>appeal</u> <u>dismissed</u>, No. 14-7180, 2015 WL 1607711
(D.C. Cir. Apr. 2, 2015).

Circuit in <u>Moore</u> clearly held that the Supreme Court "decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside." <u>Moore</u>, 702 F.3d at 942. Under Illinois law, the residents of all but four states cannot apply for or obtain a concealed carry license in Illinois because their states do not have substantially similar laws. Further, as was the case in <u>Moore</u> and <u>Ezell</u>, which applied something more than intermediate scrutiny, Plaintiffs are law-abiding, responsible citizens and the case involves the central self-defense component of the Second Amendment. <u>See</u> <u>Ezell</u>, 651 F.3d at 708; <u>Moore</u>, 702 F.3d at 940.

On the other hand, the Supreme Court specifically stated that long-standing prohibitions on the possession of firearms by felons and the mentally ill are permissible. <u>Heller</u>, 554 U.S. at 627. If Illinois' law is considered a prohibition on certain people carrying concealed handguns in public, then intermediate scrutiny would be appropriate. <u>See</u> <u>Moore</u>, 702 F. 3d at 940 (a law that merely bans guns in certain places or forbids a class of persons who present a higher than average risk of misusing a gun from possessing them

Page **49** of **64**

require a lesser showing of justification).  Admittedly, the law at issue here does not just prohibit nonresidents who are felons or mentally ill from obtaining a license because the law limits nonresident applications based on the nonresident's states' law. However, the regulations are meant to identify individuals who would be unqualified to carry a concealed firearm—something Defendants assert they cannot do if the nonresident's state does not have substantially similar laws.  The very few cases that have addressed a similar issue (and which involved bans on most, if not all, nonresidents) suggest that intermediate scrutiny is appropriate.

For example, in <u>Peterson v. Martinez</u>, 707 F.3d 1197 (10th Cir. 2013), the majority found that Colorado law, which did not grant nonresidents concealed carry licenses, did not violate the Second Amendment.  The majority found that carrying a concealed firearm was not protected by the Second Amendment because bans on the concealed carry of firearms were longstanding.  The concurring judge further noted, however, that even if concealed carry were protected, he would have applied intermediate scrutiny and found the state carried its burden.  <u>Id.</u> at 1216 (Lucero, J., concurring).  In

Page **50** of **64**

that case, the government had proffered unrefuted evidence

demonstrating that much of the information necessary to determine

whether an individual was qualified was kept in locally maintained

databases and Colorado did not have access to such information

with respect to nonresident applicants.  The concurring judge would

have found that, while the residency requirement governed the vast

majority of individuals in the United States, it burdened a relatively

small proportion of individuals present in the state at any time.  Id.

at 1219.  In light of the state officials' statements that they would

be unable to determine whether a nonresident applicant was

qualified to obtain a concealed handgun license, the concurring

judge concluded that the residency requirement was substantially

related to the stated governmental objective.  Id. at 1217; see also,

e.g., Bach v. Pataki, 408 F.3d 75, 92-94 (2d Cir. 2005), overruled on

other grounds by McDonald, 561 U.S. 742 (2010) (holding, on

review of a Privileges and Immunities Clause claim, that New York's

interest in monitoring gun licenses was substantial and that the

restriction of licenses to residents and those working primarily

within the state was sufficiently related to that interest).  The Court

Page **51** of **64**

notes, however, that <u>Peterson</u> may be distinguishable because Colorado allows open carry for residents and nonresidents alike, which would suggest that the prohibition on concealed carry by nonresidents was less onerous.  <u>See</u> <u>Peterson</u>, 707 F.3d at 1209 (noting that the law the plaintiff was challenging did not "affect the ability of non-residents to openly carry firearms in the state").

Upon review of the relevant case law and the regulation at issue, the Court finds that intermediate scrutiny is appropriate. The statute at issue does not ban all nonresidents from public carry in Illinois, the statute regulates which nonresidents may publicly carry in Illinois, and the statute only burdens a small number of people at any one time.  Because the regulation does not constitute a complete ban and instead regulates concealed carry by nonresidents in Illinois, intermediate scrutiny is appropriate.

Intermediate scrutiny requires that the law must be "substantially related to an important government objective."  <u>Clark v. Jeter</u>, 486 U.S. 456, 461 (1988); <u>see</u> <u>also</u> <u>Friedman</u>, 784 F. 3d at 410 (Manion, J., dissenting) (noting that "intermediate scrutiny does not require that the ordinance be the least restrictive means,

Page **52** of **64**

but that it serve an important government interest in a way that is substantially related to that interest").  Intermediate scrutiny requires a reasonable fit between the ends and the means, not necessarily a fit that is perfect.  Ezell, 651 F.3d at 708 (quoting Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989)).

Defendants assert that Plaintiffs do not have a reasonable likelihood of success on the merits because they cannot show a Second Amendment violation.  Defendants argue that Firearm Concealed Carry Act is reasonably related to Illinois' substantial interest in preventing unqualified people from publicly carrying loaded firearms.  Defendants assert that Illinois cannot ensure that nonresidents from states without similar firearms laws are qualified to publicly carry firearms without endangering Illinois' citizens. Defs. Mem. at 16.  Even if Defendants could confirm an applicant were qualified when he or she applied, Defendants have no means to ensure that that individual continues to be qualified. Information on disqualifying out-of-state mental health conditions, arrests, and prosecutions is not reliably available through national databases.  Id.  Moreover, out-of-state mental health providers and

Page **53** of **64**

law enforcement officials are under no obligation to notify Illinois should they discover a nonresident's disqualifying condition.  Id.

In response, Plaintiffs argue that the statute will not survive intermediate scrutiny.  Plaintiffs assert the State has no interest in denying virtually all nonresidents their right to handgun possession based solely on their states of residence and they should at least be allowed to apply for a concealed carry license.  Pls. Mem. at 17. Plaintiffs assert that it is enough that the nonresidents would have to meet the same qualifications that every Illinois concealed carry license holder must meet.  Id. at 20 (argument raised in support of the Equal protection challenge).  At the hearing, Plaintiffs argued that Illinois trusts nonresidents with firearms in numerous other capacities, as demonstrated by the exceptions to the FOID Act for hunting, carrying a weapon in a vehicle, and possessing a functional firearm in the home of an Illinois resident.  See 430 ILCS 65/2(b)(5), 2(b)(9), 2(b)(10), 2(b)(13).  Plaintiffs additionally pointed out, by way of example, that if an Illinois resident with an Illinois concealed carry license goes to college in a state without laws

substantially similar to Illinois, Illinois is not in a position to monitor that person's conduct in that other state.

At this stage of the litigation, the Court finds that Plaintiffs can show at least a better-than-negligible likelihood of success on the merits. While Defendants have pointed to evidence tending to show an important and strong governmental interest, it is possible that Defendants' evidence will not ultimately show that the regulations will, in actuality, alleviate the problem identified— preventing unqualified individuals from publicly carrying loaded firearms. See, e.g., Mance v. Holder, 74 F. Supp. 3d 795, 813 (N.D. Tex. 2015) (finding that the federal interstate handgun transfer ban was unconstitutional on its face, even under intermediate scrutiny, because the defendants did not carry their burden of showing how the ban would "alleviate, in a material way, the problem of prohibited persons obtaining handguns" and unconstitutional as applied because the plaintiffs likely did not pose the threat to public safety that motivated Congress to enact the ban), appeal filed. For instance, the Court notes that the survey sent to the other states may not have been tailored toward finding out all of the information

Page **55** of **64**

Illinois claims it needs to ensure that the other state has substantially similar laws.  In addition, on the record currently before the Court, two of the states found to have substantially similar laws answered one of the questions on the survey, "no."  <u>See</u> d/e 23-1, p. 41 of 87; d/e 23-2, p. 63 of 87 (wherein New Mexico and Virginia answered "No" to Question No. 5—"Does your state have a mechanism to track or report voluntary mental health admissions for the purpose of revoking or approving a concealed carry license?").

Consequently, the Court finds that Plaintiffs can show at least a better-than-negligible likelihood of success on the merits.  Having found that Plaintiffs have a better-than-negligible chance of success on their Second Amendment claim, the Court need not address Plaintiffs' likelihood of success on the merits of the remaining claims. <u>See</u> <u>Girls Scouts</u>, 549 F.3d at 1096.

2.  <u>Plaintiffs Can Show Irreparable Harm and No Adequate Remedy at Law</u>

To obtain a preliminary injunction, the movant must "establish that it will be irreparably harmed if it does not receive

Page **56** of **64**

preliminary relief, and that money damages and/or an injunction

ordered at final judgment would not rectify that harm." <u>Abbott</u>

<u>Labs. v. Mead Johnson & Co</u>, 971 F.2d 6, 16 (7th Cir. 1992).  As

stated in <u>Roland Machinery</u>:

> The absence of an adequate remedy at law is a
> precondition to any form of equitable relief. The
> requirement of irreparable harm is needed to take care of
> the case where although the ultimate relief that the
> plaintiff is seeking is equitable, implying that he has no
> adequate remedy at law, he can easily wait till the end of
> trial to get that relief.

749 F.2d at 386.

Plaintiffs argue that they enjoy a fundamental right to keep

and bear arms.  The denial of that right, even temporarily,

constitutes irreparable harm for purposes of granting injunctive

relief.

In <u>Ezell</u>, the Seventh Circuit recognized that irreparable harm

is presumed for some kinds of constitutional violations, such as

First Amendment violations.  <u>Ezell</u>, 651 F.3d at 699.  The Court

stated, "[t]he Second Amendment protects similarly intangible and

unquantifiable interests." <u>Id.</u>  Moreover, the <u>Ezell</u> Court noted that

<u>Heller</u> held that the central component of the right to possess

Page **57** of **64**

firearms is for protection, and infringement of such a right could not be compensated by damages.  Id.

Defendants attempt to distinguish Ezell on the basis that Ezell involved a firing-range ban which, coupled with Chicago's training requirement, implicated a ban on the core right to possess firearms in the home for self-protection.  Defendants contend that Plaintiffs cannot demonstrate any infringement on their right to defend "hearth and home" because they live in other states and the Carry Act only concerns public carriage.  Defendants also contend that Plaintiffs have failed to demonstrate any continuing violation because they travel or visit only occasionally or half of their time, they have not indicated that they work in places that would allow them to bring their firearms to work (for those who work in Illinois), and those who travel on Illinois highways are permitted to carry the gun inside a vehicle so long as the gun is unloaded and cased. Finally, Defendants argue that the Plaintiffs only seek the ability to apply for a license and whether they would be found qualified is speculative.

Given the strong language in <u>Ezell</u>, Plaintiffs meet the requirement of showing a lack of an adequate remedy at law and irreparable harm if the injunction is not granted. <u>See</u> <u>Bolton v. Bryant</u>, 71 F. Supp. 3d 802, 818 (N.D. Ill. 2014) (holding that the denial of a license to carry a concealed weapon without due process of law would infringe on the plaintiff's Second Amendment right, he would suffer irreparable harm, and he would have no adequate remedy at law) (citing <u>Ezell</u>, 651 F.3d 699); <u>see</u> <u>also</u> <u>e.g.</u>, <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976) (plurality opinion) ("the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").[12]

## B.    The Balance of Harms and the Public Interest Weigh in Favor of Denying the Preliminary Injunction

Because the Court has found that Plaintiffs have a reasonable likelihood of success on the merits, no adequate remedy at law, and irreparable harm, the Court must weigh the balance of harm to the parties if the injunction is granted or denied.  The Court must also

---

[12] The Seventh Circuit has noted that "<u>Heller</u> and <u>McDonald</u> suggest that First Amendment analogues are more appropriate" to develop the appropriate level of scrutiny for reviewing Second Amendment violations.  <u>Ezell</u>, 651 F. 3d at 706.

consider the public interest.  And, as noted above, the likelihood of success on the merits affects the balance of the harms.  Planned Parenthood, 699 F. 3d at 972; Backpage.com, LLC v. Dart, --- F. Supp. 3d ---, No. 15 C 06340, 2015 WL 5174008, at *12 (N.D. Ill. Sept. 2, 2015)(finding that the small likelihood of success on the merits affected the balancing test and concluding that the plaintiff therefore must establish that the balance of harms "falls decisively on its side"), appeal filed.

Plaintiffs argue that the balance of interests favor immediate injunctive relief.  According to Plaintiffs, they are certain to prevail on the merits.  Absent relief, they will continue to suffer irreparable injury, if not actual physical harm.  According to Plaintiffs, the State has no legitimate interest in the prohibition, and the public interest strongly favors equal protection of the law, respecting fundamental rights, and the ability of all law-abiding persons in Illinois to defend themselves equally.  Plaintiffs also ask that the Court at least allow them to apply for a concealed carry license.

Defendants disagree that the balance of interests favor immediate injunctive relief.  Defendants assert that the goal of

Page **60** of **64**

preserving the status quo warrants denial of the Plaintiffs' motion in favor of preserving the current firearm scheme pending a full adjudication on the merits.  The risk to the public of an erroneous decision involving firearms is self-evident and outweighs the speculative harm to Plaintiffs while the case proceeds.  Defendants also assert that even if Plaintiffs are entitled to injunctive relief at this stage, their request is overly broad.  Even if a preliminary injunction were warranted, the Court should order no more than that the ISP permit the named Plaintiffs who have expressed a desire to apply to do so notwithstanding the residency requirements.

Before balancing the harms, the Court must determine how likely Plaintiffs are to win because that likelihood affects the balance of harms.  The Court finds that Plaintiffs' likelihood of success is neither strong nor weak.  Therefore, the balance of harms must weigh slightly more in Plaintiffs' favor than in Defendants' favor for the preliminary injunction to be granted.  See, e.g., Roland Mach., 749 F.2d at 387 (the more likely the plaintiff is to win, the less heavily the balance of harms must favor the plaintiff

Page **61** of **64**

and vice versa).  Moreover, the effect on the public must favor granting a preliminary injunction.

In this case, the balance of harms favors denying a preliminary injunction.  When comparing the potential irreparable harm faced by Plaintiffs if the preliminary injunction is wrongfully denied versus the potential irreparable harm faced by Defendants if the preliminary injunction is wrongfully granted, the Court finds that balance of harms weights more strongly in favor of Defendants. Defendants have indicated that they do not have the funds to perform a complete record search of applicants in other states. Even if Plaintiffs meet the application requirements and are issued a concealed carry license, Defendants do not have the means to monitor those Plaintiffs in the same manner that Illinois residents are monitored.  Therefore, if the preliminary injunction is erroneously granted, Plaintiffs could obtain concealed carry licenses because they qualify, but Illinois would have no procedure in place to ensure continued compliance with the Illinois requirements should Plaintiffs' circumstances change.  Moreover, the public has a strong interest in ensuring that those permitted to carry concealed

Page **62** of **64**

handguns in Illinois are qualified to do so and remain qualified to do so even after the license is granted.  <u>See</u>, <u>e.g.</u>, <u>See</u> <u>Bolton</u>, 71 F. Supp. 3d at 818 (finding the harm to the plaintiff if the preliminary injunction were denied did not overcome the harm to the public interest where the public had a significant interest in "keeping a concealed weapon out of the hands of a man who allegedly impersonated a peace officer and unlawfully used a weapon").

In contrast, while Plaintiffs are being denied the ability to carry concealed in Illinois, Plaintiffs are permitted to carry concealed handguns in their home states, can bring firearms to Illinois in their vehicles, can possess functioning firearms in the homes of Illinois residents with permission, can hunt, and can take their firearms to shooting ranges.  The Court points this out not to suggest that the harm is measured by the extent to which the right to bear arms may be exercised in another jurisdiction.  <u>See</u> <u>Ezell</u>, 651 F.3d at 697 (rejecting the argument that the plaintiffs did not suffer irreparable harm because they could travel longer distances to use a firing range, which was a quantifiable expense). Instead, the Court mentions this fact to demonstrate that the extent of the

Page **63** of **64**

irreparable harm is limited to those occasions when Plaintiffs will be present in Illinois in a capacity in which they would be able to carry a concealed handgun if they had the appropriate license. Moreover, the Court by no means intends to diminish the potential irreparable harm to Plaintiffs by not being able to carry concealed in Illinois. However, given that the Plaintiffs' likelihood of success on the merits is not strong and the balance of harms favors Defendants and the public, the Court denies Plaintiffs' request for a preliminary injunction.

## VI. CONCLUSION

For the reasons stated, Plaintiffs' Motion for Preliminary Injunction (d/e 17) is DENIED.

ENTER: December 4, 2015

FOR THE COURT:

s/Sue E. Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE